The ONEIDA INDIAN NATION OF NEW YORK; Robert W. Burr, Jr., Individually and as President of the Oneida Indian Nation of New York; John Logan, Individually and as Vice-President of the Oneida Indian Nation of New York; Winnifred Jacobs, Individually and as Treasurer of the Oneida Indian Nation of New York; Geralda Thompson, Individually and as Clerk of the Oneida Indian Nation of New York; Tamara Rodgers, Individually and as Recording Secretary of the Oneida Indian Nation of New York; Janice Luongo, Individually and as Corresponding Secretary of the Oneida Indian Nation of New York; Richard Isaac, Individually and as Sergeant at Arms of the Oneida Indian Nation of New York; Rae Ellen Bandera; Priscilla R. Burnette; Ralph Burr; Ruth Burr; Patrice Cook; Renie Cooke; Muriel Cornelius; Thelma Cornelius; Cynthia Denise; Benjamin Doxtator; Cecelia E. Drew; Lena Fougnier; William C. Fougnier; Anderine Gant; Abbie George; Earl George; Keller George; Marilyn George; Barry Greene; Irene Greene; Vicke Greene; Wally Greene, Jr.; James W. Hill; Leon John Hill; Cliff Isaacs; Ernie Jacobs; Lori Jacobs; Sheila Jacobs; Arthur Jones, Sr.; Elizabeth Jones; Emily Jones; Jack K. Jones; Lenora Jones; Lorna Jones; Merna Jones; Rhonda Jones; David Kilbourn; Frank Kilbourn; John E. Kilbourn; Bonnie Kristianovich; Daisy Laforte; Barbara Lafrance; Edna Leonard; Kevin Leonard; Sally Marquez; Kathy Overton; Alda Pierce; Gilbert Powless; Shirley Powless; Roberta Rice; Edward Rodgers; Iva Rodgers; Wanda Rommevaux; Lavina Schenadoah; Mary L. Sequin; Mary M. Sequin; Judith Square; Roy Smith; Neil S. Thomas; Jacob Thompson; Vernon Thompson; Florence Warren; Delia Waterman; Charles Webster; Erwin Webster; John Webster; Roberta Webster; Roxanne Webster and Glen Wheelock, Plaintiffs,

v.

The STATE OF NEW YORK, et al., Defendants.

The ONEIDA INDIAN NATION OF WISCONSIN, also known as the Oneida Tribe of Indians of Wisconsin, Inc., and the Oneida of the Thames Band, Plaintiffs,

v.

The STATE OF NEW YORK; the County of Broome, New York; the County of Chenango, New York; the County of Cortland, New York; the County of Delaware, New York; the County of Herkimer, New York; the County of Jefferson, New York; the County of Lewis, New York; the County of Madison, New York; the County of Oneida, New York; the County of Onondaga, New York; the County of St. Lawrence, New York; the County of Tioga, New York; Valentine Ryan; St. Regis Paper Company and Georgia-Pacific Corp., Individually and as representatives of all others similarly situated, Defendants,

and

New York State Electric and Gas Corporation, Individually, Defendant-Intervenor.

Nos. 78–CV–104, 79–CV–798.

United States District Court, N. D. New York.

July 24, 1981.

As amended Sept. 10, 1981.

D. C., for plaintiffs Oneida Indian Nation of Wis. and Oneida of the Thames Band; Francis Skenandore, Tribal Atty. for the Oneida Indian Nation of Wis., Oneida, Wis., of counsel.

Bertram E. Hirsch, Bellerose, N. Y., for plaintiffs Oneida Indian Nation of New York, et al.

Robert Abrams, New York State Atty. Gen., Albany, N. Y., for State of New York and defendants State Agencies and Officials; Jeremiah Jochnowitz, Asst. Atty. Gen., Albany, of counsel.

Goodwin, Proctor & Hoar, Boston, Mass., for defendant Counties and defendant Ryan, individually and as class representatives; Alan van Gestel, Boston, Mass., of counsel.

Hiscock, Lee, Rogers, Henley & Barclay, Syracuse, N. Y., for defendants St. Regis Paper Co., individually and as class representative and Georgia-Pacific Corp., as class representative; Richard D. Davidson, Syracuse, N. Y., of counsel.

Shearman & Sterling, New York City, for defendant Georgia-Pacific Corp., individually; Arnold Bauman, Thomas M. Geisler, Jr., New York City, of counsel.

Huber, Magill, Lawrence & Farrell, New York City, for defendant-intervenor New York State Elec. & Gas Co.; Howard M. Schmertz, Frederic H. Lawrence, New York City, of counsel.

Robert T. Coulter, Washington, D. C., for the Six Nations and its constituent Nations, amicus curiae.

## MEMORANDUM—DECISION AND ORDER

McCURN, District Judge.

During the past decade, Indian tribes have brought numerous lawsuits asserting claims to large tracts of land in the Northeast United States.[1] The actions have thus

Arlinda Locklear, L. A. Ashenbrenner, Native American Rights Fund, Washington,

---

1. See e. g. Mohegan Tribe v. State of Connecticut, 483 F.Supp. 597 (D.Conn.1980), aff'd 638 F.2d 612 (2d Cir. 1981), cert. denied 450 U.S. 1028, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); Oneida Indian Nation v. County of Oneida, 464 F.2d 916 (2d Cir. 1972), rev'd 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), on remand 434 F.Supp. 527 (N.D.N.Y.1977); Mashpee Tribe v. Town of Mashpee, 447 F.Supp. 940 (D.Mass. 1978), aff'd sub nom. Mashpee Tribe v. New Seabury Corp., 592 F.2d 575 (1st Cir.), cert. denied, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979); Schaghticoke Tribe of Indians v. Kent School Corp., 423 F.Supp. 780 (D.Conn.

far involved challenges to the validity of treaties for the purchase of these lands entered into between the States and the Indian tribes subsequent to the adoption of the United States Constitution and after the enactment of the Nonintercourse Act in 1790, 25 U.S.C. § 177. In each instance the suits have been based upon a claim that the treaties were entered into in violation of the Nonintercourse Act which allegedly placed federal restrictions on the alienation of Indian lands.[2]

The actions now before the Court represent a departure from the established pattern. For the first time in Indian land claim litigation, a challenge is being waged to the validity of treaties involving land which were entered into prior to the adoption of the United States Constitution and during the period in American history when the Articles of Confederation were in effect. The treaties in issue were entered into between the State of New York and the Oneida Indian Nation in 1785 and 1788. Based upon a claim of aboriginal title, allegedly confirmed and guaranteed by federal treaties, plaintiffs seek a declaration of

their right to possession of over five million acres of land located in central New York State and depicted on a map filed with the complaints as a swath of land fifty to sixty miles in width extending from the Pennsylvania border to the Canadian border and encompassing portions of thirteen counties. Plaintiffs also request relief restoring them to possession of their aboriginal territory and awarding them damages for the entire period of their dispossession.

These lawsuits are presently before the Court for decision on the defendants' motions to dismiss and for determination of a motion to intervene made on behalf of the Six Nations of the Iroquois Confederacy.[3]

## PARTIES

### 79–CV–798

Plaintiff Oneida Indian Nation of Wisconsin is described in the complaint as an "Indian nation or tribe recognized by the United States with its reservation and principal situs in the State of Wisconsin." Plaintiff Oneida of the Thames is described as an "Indian nation or tribe recognized by

---

1976); *Narragansett Tribe of Indians v. Southern Rhode Island Development Corp.*, 418 F.Supp. 798 (D.R.I.1976); *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 388 F.Supp. 649 (D.Me.1975); *aff'd* 528 F.2d 370 (1st Cir. 1975). *See also Cayuga Indian Nation v. The State of New York*, No. 80–CV–930 (N.D.N.Y., filed Nov. 19, 1980).

2. Congress enacted the first Nonintercourse Act in 1790. Act of July 22, 1790, ch. 33, 1 Stat. 137. Section 4 of the Act provided that:
 ... no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person, persons, or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.
 The Act has been amended on several occasions, and the present Nonintercourse Act at 25 U.S.C. § 177 states in pertinent part that: No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

3. On July 15, 1980, the Six Nations Confederacy and the Mohawk, Oneida, Onondaga, Cayuga, Seneca and Tuscarora Nations individually and as members of the Confederacy, believing themselves to be members of the defendant class certified by the Court in 79–CV–798, filed a motion for leave to appear and be separately represented in the action. When it was later determined that they were not intended to be class members, the parties filed a motion to intervene both as a matter of right or in the alternative permissively, pursuant to Rule 24 of the Fed.R.Civ.P.

 The Court heard argument on the intervention motion on October 27, 1980. Concluding that the proposed intervenors were adequately represented with respect to the issues raised on the motions to dismiss, the Court decided to defer decision on the intervention motion pending determination of those motions. The proposed intervenors were advised that they would be permitted to file an *amicus* brief in opposition to the motions to dismiss limited to those issues raised on the motions. A brief was filed on behalf of the Six Nations and its constituent members, and counsel for the Confederacy was allowed to participate in oral argument.

Canada with its reserve and principal situs in Southwold, Canada." Both plaintiffs allege that they, along with the Oneida Indian Nation of New York, are the direct successors in interest to the Oneida Indian Nation which occupied the lands claimed in the action since time immemorial.

The action was commenced on December 5, 1979, by the filing of a complaint naming one-hundred and fifty-two defendants, individually and as representatives of a proposed class of defendants. Included among the named defendants were the State of New York and several of its administrative agencies and officials, counties and municipalities located in the claims area, businesses, and numerous individual land owners in the area involved.

By Memorandum-Decision and Order of March 4, 1980, as amended, 85 F.R.D. 701 (N.D.N.Y.1980) (reported without amendments), this Court certified a defendant class consisting of all persons who claim an interest in any portion of the subject land as described in the plaintiffs' complaint, with the exception of individual Oneida Indians and persons who occupy the land as a principal place of residence to the extent of the residence and up to two surrounding acres.[4] The defendant class consists of approximately 60,000 individuals, businesses and governmental entities and officials. Certain of the defendants were designated by the Court to serve as representatives of the class, and the action was dismissed as to the remaining named defendants who then became members of the class. The Court directed that notice be sent to the members of the defendant class advising the members of the lawsuit and giving them an opportunity to object to certification or otherwise appear or seek to intervene in the action.[5]

*78-CV-104*

This action, challenging the same transactions as 79-CV-798, was initially commenced by the Oneida Nation of New York and several of its members on March 3, 1978, prior to the commencement of 79-CV-798.[6] Plaintiffs allege that the Oneida Nation of New York is an Indian nation or tribe recognized by the United States government. With respect to the individual plaintiffs, the complaint asserts that "[t]hese individuals and other members of the Oneida Indian Nation of New York are the direct matrilineal descendants of the aboriginal Oneida Indian Nation which since time immemorial owned and occupied approximately 6,000,000 acres of land in central New York State."

Also proposed as a defendant class action, this lawsuit was brought against the State of New York, the New York State Thruway and certain State officials, individually and on behalf of a class of all similarly situated officials of New York State, its agencies, commissions, boards, departments and authorities.

The State of New York responded to the complaint by the filing of a motion to dis-

---

4. Familiarity with the Court's decision on class certification will be presumed.

5. The motions to dismiss have been brought primarily by counsel for the defendants chosen as class representatives. There are, however, two exceptions.

 Subsequent to the issuance of the Court's certification decision, the law firm of Shearman & Sterling appeared on behalf of defendant Georgia-Pacific Corporation, individually. The corporation had been named as a class representative with the law firm of Hiscock, Lee, Rogers, Henley & Barclay as counsel for the defendant in its representative capacity. Both counsel have joined in moving for dismissal of these actions.

 In addition, in response to the notice of class certification, defendant class member New York State Electric & Gas sought and was allowed to intervene and appear individually in the action and now also joins in seeking dismissal.

6. Plaintiffs in 79-CV-798 acknowledge that the Oneida Indian Nation of New York holds an interest in the subject lands identical to their own. However, as pointed out in the complaint, the Oneida Indian Nation is presently without a federally recognized governing body thus preventing the tribe from agreeing to join plaintiffs in that action.

 The tribal dispute over recognition of a governing body by the United States Department of Indian Affairs is presently the subject of litigation presently pending before this Court in *Oneida Indian Nation of New York v. Andrus*, No. 79-CV-652 (N.D.N.Y. filed Oct. 5, 1979).

miss. However, prior to argument on that motion, 79–CV–798 was commenced, and the plaintiffs in 78–CV–104 chose to amend their complaint to conform substantially to that in the more recently filed action.[7] In their amended complaint, the plaintiffs also added considerably to the list of named defendants, including various State commissioners and authorities, and the counties in the claims area. There are, however, still no nongovernmental defendants in the action. No motion has as yet been made for certification of the proposed defendant class in this action.

## FACTUAL ALLEGATIONS

Plaintiffs in both actions allege that from time immemorial up until the time of the acts complained of, the Oneida Indian Nation of New York owned and occupied over five million acres of land in central New York State. In their respective complaints, the plaintiffs give the following account of the historical events leading up to and resulting in the loss of the lands which they now seek to recover.

### The Oneida Indian Nation and the Federal Government

The plaintiffs begin their discourse with the colonial period, asserting that during that time the British Crown pursued a policy of protecting Indian tribes in the peaceful possession of their lands through the establishment of boundaries between the American colonies and the native tribes. Such a boundary was established between the colonies and the Six Nations by a treaty concluded at Fort Stanwix on November 5, 1768. Pursuant to that treaty, the boundary line originated in northern New York State near the eastern end of Lake Ontario, south to the Delaware River, west to the Allegheny River and west along the Ohio to the mouth of the Tennessee River. The portion of the line north of Pennsylvania is claimed to have constituted the southern half of the eastern boundary of the Oneida aboriginal territory.

At the outbreak of the hostilities leading up to the American Revolution, the Six Nations declared their intent to remain neutral. However, during the War the Oneidas and Tuscaroras sided with the colonists while the four remaining tribes fought with the British. The American Revolution was concluded by the Treaty of Paris in 1783. The Treaty contained no provision with respect to the Indians. Plaintiffs allege that thereafter the Continental Congress acted to adjust relations with the Indian tribes pursuant to the authority granted it under the Articles of Confederation.

Congress created Indian Departments to implement these policies and to make peace with the Indians. On September 22, 1783, the Congress issued a Proclamation dealing with the issue of the authority and control of the central government over the trade and management of affairs with the Indians and prohibiting the purchase of or settlement on certain Indian lands without the permission of the federal government.

According to the plaintiffs, in October of 1783, the Continental Congress issued instructions to the Northern Indian Department to negotiate peace with the hostile tribes and as set forth in the complaints to

> reassure the said tribes [the Oneidas and Tuscaroras, who had been allies of the Colonies] of the friendship of the United States and that they may rely that the lands which they claim as their inheritance will be reserved for their sole use and benefit until they think it for their own advantage to dispose of the same.

On October 22, 1784, federal commissioners concluded the Treaty of Fort Stanwix (7 Stat. 15) with the Six Nations. That Treaty provides at Article II that "[t]he Oneida and Tuscarora Nations shall be secured in the possession of the lands on which they are settled." *Id.* Plaintiffs allege that prior to the signing of the Treaty, the federal commissioners in the course of inviting the

---

**7.** The plaintiffs in 78–CV–104 filed their amended complaint on July 3, 1980, in accordance with the schedule contained in a pretrial order of the Court. There are still some differences in the claims made by the respective plaintiffs, and these will be addressed by the Court as they become relevant.

Oneidas to treat with the United States had advised the Indians ". . . that a treaty with an individual state, without the sanction of Congress, could be of no validity."

The plaintiffs also assert that the Governor of New York was informed of the central government's intent to treat with the Six Nations and advised that any business which the State might have with the tribe would be ". . . more properly transacted at the same time and in subordination to the General Treaty." While New York State did send representatives to observe the treaty negotiations at Fort Stanwix, no business was transacted between the State and the Six Nations at that time.

A second treaty between the United States and the Six Nations was concluded on January 9, 1789, at Fort Harmar (7 Stat. 33). This Treaty allegedly confirmed the obligations which the United States undertook in the Treaty of Fort Stanwix by again promising that the Oneida Nation would be "secure in the possession of [its] lands." *Id.* at Art. III.

Subsequent to the adoption of the Constitution and the enactment of the Nonintercourse Act, the United States and the Six Nations entered into a final treaty on November 11, 1794, in Canandaigua, New York. Plaintiffs contend that this Treaty once again served as a reaffirmation of the federal obligation to protect the Oneida's rights to their aboriginal lands.

*The Oneida Nation and New York State*

Plaintiffs allege in their complaints that in March of 1783 the New York State Legislature instructed its commissioners

> . . . to accomplish an Exchange of the District claimed by the Oneida's [sic] and the Tuscaroras, for a district of vacant and unappropriated Lands within this state. In the execution of this trust, you are to proceed with caution and reserve, so as not to alarm the Oneida's and Tuscarora's [sic] with apprehensions that there is the most remote Intention to deprive them of the enjoyment of the District belonging to them. On the contrary you are on all proper occasions to impress them with a confidence that this State will suffer no encroachment to be

made within their limits nor any Settlement thereon without their free consent.

In 1784 Governor Clinton is said to have invited the Oneida Nation to treat with the State on the pretext of ascertaining the boundaries of the tribe's land to prevent trespass by non-Indians. Although the Oneidas apparently met with the State commissioners in September of 1784, no treaty was concluded. However, in 1785, the New York Legislature authorized the commissioners to make a second attempt to obtain land from the member tribes of the Six Nations. The commissioners invited the Oneida Nation to meet with them at Fort Herkimer. The complaints offer the following account of the transaction.

The Fort Herkimer Treaty council began on June 23, 1785. Governor Clinton offered to protect the Oneidas from further incursions on their land by white settlers by having the State purchase a large tract of Oneida land along the Unadilla River as a buffer zone between the white settlements and the Indian land. The Oneidas objected to an outright sale of their land, offering instead to lease the land to the State. Governor Clinton then is said to have angrily rejected the Oneida offer threatening to withhold State protection against the trespass on Indian lands. Allegedly after two days of what has been described by plaintiffs as "threats and coercion" the Oneidas acceded and the Treaty was concluded on June 23, 1785, with the Oneidas ceding some 300,000 acres of land from their southern border.

Attempts by non-Indians to lease and purchase Oneida land continued after the Treaty of 1785, and in 1788 the Oneidas were induced to enter into a 999 year lease of all of their lands to a speculator named John Livingston. No consideration changed hands and the lease was declared void by the New York State Legislature for failure to secure State approval. However, plaintiffs claim that without advising the Oneidas that it had been voided, the State used the Livingston lease as a pretext for requesting another treaty with the Oneidas.

Plaintiffs quote from an April 1788 invitation from the State to the Oneidas which while recognizing that the white lessees had taken advantage of the Indians concluded that:

> . . . it is not too late to make all things right; and if you attend at the Council Fire which will be lighted at Fort Schuyler the 10th day of July next, your true and ancient Friends the Governor and Chiefs of the State will meet you there, and will brighten the chain of Friendship, and will put you in the right way and will support you in it.

The plaintiffs contend that the Oneidas interpreted the message from the commissioner as meaning that by treating with the State, they would regain possession of their lands and thus accepted the invitation.

Negotiations between the Oneidas and the State commenced on September 16, 1788, at Fort Schuyler. Governor Clinton is alleged to have repeatedly assured the Oneidas that the purpose for the treaty council was the protection of the Indian's lands from the Whites rather than an attempt to purchase the land. The Oneidas were purportedly advised that they should place all of their land in the hands of the State and under its protection forever, reserving a tract for the use and occupation of the tribe. Plaintiffs suggest that the Oneidas interpreted the Governor's proposal as an agreement that the State would regulate the settlement of Indian lands and would pay the Oneidas a yearly rent to be increased periodically as the lands became settled. The Oneidas accepted the Governor's proposal allegedly believing that their lands had been restored to them and only leased or entrusted to the care of the State for their own protection.

The State did not make periodic rent increases and in 1839 ceased making payments altogether as the result of passage of a State statute capitalizing the periodic payments and extinguishing future payment obligations through a lump sum payment. Chap. 518 N.Y.Laws, 1839.

Plaintiffs contend that the United States neither participated in nor authorized either the 1785 and 1788 Treaties or the passage of the 1839 statute. Nor according to plaintiffs, has the United States subsequently ratified any of the above State actions.

## PLAINTIFFS' CLAIMS

The complaints in both of these actions set forth the same five claims for relief. The first claim, asserted against all of the defendants and defendant class members, is premised upon plaintiffs' contention that Article IX of the Articles of Confederation bestowed upon the federal government the sole and exclusive authority to enter into treaties and regulate affairs with the Indian tribes located within the boundaries of the States, including New York. According to plaintiffs, issuance of the Proclamation of September 22, 1783, and the negotiation of the Fort Stanwix Treaty constituted legitimate exercises of the authority granted the central government under the Articles. For their first claim for relief, plaintiffs allege that the 1785 and 1788 Treaties entered into between the Oneida Indian Nation and New York State are void for violation of Article IX of the Articles of Confederation, the Proclamation of 1783 and the Treaty of Fort Stanwix of 1784. The plaintiffs in 78–CV–104 assert in addition that the Treaty of 1788 is void for violation of sections 8 and 10 of the United States Constitution. These same plaintiffs also include a claim under 42 U.S.C. § 1983.

The second claim, also against all of the defendants and defendant class members, charges that the 1785 and 1788 Treaty negotiations were conducted "in an atmosphere of deceit, threat, and coercion." Thus, according to plaintiffs, the Oneidas did not voluntarily sell their land but merely acceded to the State's demands under fraud and duress. Plaintiffs argue that as a result of the misconduct of State officials and the unequal bargaining power of the parties, along with the allegedly unconscionable consideration imposed by the State, that a constructive trust arose with respect to the land involved in these transactions, with the State as trustee and the Oneidas as beneficiaries. According to plaintiffs, the beneficial title which rested

in the Oneidas as a result of the imposition of the constructive trust, came under the protection of the Nonintercourse Act upon its enactment in 1790. Claiming that the federal government has not since consented to the sale or extinguishment of the Oneida's interest in the land, plaintiffs allege that the Oneidas presently hold equitable title thereto.

For their third claim, against the State of New York alone, plaintiffs allege that the State fraudulently misled the Oneida Nation about the purpose and intent of both the 1785 and 1788 Treaties, by representing the purpose to be the protection and preservation of Oneida lands rather than acquisition of the land for its own use as actually intended. Plaintiffs assert that the Oneida Nation relied upon the State's misrepresentations in agreeing to the Treaties and was thereby deprived of the use and possession of the subject lands.

The fourth claim, also directed against the State alone, is based upon plaintiffs' assertion that the 1788 Treaty did not constitute an outright sale but either a perpetual lease or express or implied trust. In conjunction with that claim, plaintiffs contend that under Article 37 of the New York State Constitution [1777], the State had assumed an express trust obligation to protect Indian lands within its borders. Plaintiffs claim that the State breached both Article 37 and the terms of the lease or trust agreement by inducing the Oneidas to execute the 1788 Treaty by deception and fraud, by failing to make promised increases in annual payments for the use of the land and by purporting to unilaterally extinguish its future rental obligation by capitalizing all future payments into one lump sum payment in 1839. Plaintiffs contend that as a result of the State's actions, they have a reversionary or beneficial interest in the land involved in the transaction, which became subject to the federal restriction on alienation imposed by the enactment of the Nonintercourse Act.

Plaintiffs' final claim for relief, this one asserted against all of the defendants and defendant class members, involves an allegation that the 1788 Treaty was fatally vague in that the provisions for periodic increases in annual payments failed to specify the rate or amount of increase. Arguing that this allegedly material provision of the Treaty was so indefinite as to be unenforceable, plaintiffs contend that no interest in the subject lands passed to New York State by the agreement. Thus, according to plaintiffs, upon passage of the Nonintercourse Act, the Oneida's title to the land became subject to the federal restriction on alienation.

The plaintiffs seek the following relief with respect to the foregoing claims:[8] (1) a declaration that they are the owners of and have the right to possession of all of the subject land claimed or held by any defendant or member of a defendant class, or in the alternative, a declaration that plaintiffs have a reversionary or beneficial interest in that part of the subject land conveyed to defendant State of New York in 1788 and an order directing the State to specifically perform its obligations under the Treaty of 1788 with the Oneida Indian Nation; (2) restoration to immediate possession of all portions of the subject land claimed by any defendant or member of a defendant class; (3) an award of the fair rental value for all of the subject land claimed by the defendants and defendant class members for the entire period of the plaintiffs' dispossession; and (4) an award of all costs and attorneys fees. Plaintiffs in 78–CV–104 seek the following additional relief: (1) interest on the fair rental value for all of the subject land for the entire period of the plaintiffs' dispossession; (2) an award of all tolls collected by defendant New York State Thruway Authority for passage over Oneida lands, including all tolls collected until judgment is entered; and (3) a declaration of plaintiffs' hunting and fishing rights and all other rights under the 1788 Treaty, in the event the Court refuses to find that agreement to be void.

---

8. The claims for relief and the relief sought are, of course, directed only against the named defendants or defendant class members, in the particular lawsuit in which they were raised.

## MOTIONS TO DISMISS

Defendants seek dismissal of these actions on a number of grounds including lack of justiciability, failure to state a claim upon which relief can be granted, and the applicability of various State law defenses. The State defendants claim in addition that these lawsuits are barred by the Eleventh Amendment to the Constitution.

While the Court finds that defendants' justiciability and Eleventh Amendment arguments are without merit, it does agree that plaintiffs in these actions have failed to state a claim upon which relief may be granted in this Court and therefore grants the defendants' motions to dismiss both complaints.[9]

## JURISDICTION

Plaintiffs assert jurisdiction under 28 U.S.C. §§ 1331, 1337 and 1362. The plaintiffs in 78–CV–104 add 28 U.S.C. § 1343(3) as a jurisdictional basis for their constitutional and federal statutory claims. None of the defendants seriously disputes the presence of subject matter jurisdiction in these cases, although the Counties and Ryan challenge the Court's jurisdictional authority to determine certain issues which are alleged to raise solely questions of State law for which there is no independent federal jurisdictional basis.

■ Relying on the decision of the Supreme Court in *Oneida Indian Nation v. County of Oneida, supra,* the Court concludes that it has jurisdiction over these lawsuits under both 28 U.S.C. §§ 1331 and 1362.[10] The plaintiffs in the *County of Oneida* case challenged the validity of a 1795 land transaction between the State of New York and the Oneida Indian Nation, alleging that the conveyance violated treaties entered into between the United States and the Six Nations as well as the Nonintercourse Act.[11]

The plaintiff's complaint was dismissed by the District Court for lack of subject matter jurisdiction, and the Court of Appeals affirmed. The lower Court determinations were based upon a finding by those Courts that the plaintiff's cause of action was created solely under State law. The Courts concluded that the necessity of interpreting federal treaties and statutes was not sufficient to sustain federal Court jurisdiction over an action essentially seeking relief based on the alleged right to possession of real property.

Reversing the lower Court decisions, Justice White writing for the Supreme Court explained that:

Accepting the premise of the Court of Appeals that the case was essentially a possessory action, we are of the view that the complaint asserted a current right to possession conferred by federal law, wholly independent of state law. The threshold allegation required of such a well-pleaded complaint—the right to pos-

9. Because the Court has determined that these actions must be dismissed for legal insufficiency, it will not be necessary for the Court to discuss the issues raised with respect to defendants' indispensable party and State law defense claims for dismissal.

10. Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."

Section 1362 provides that:
The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.
While Section 1362 by its terms cannot apply to the individual plaintiffs in 78–CV–104 and

perhaps may even be unavailable to the tribal plaintiff in that case because of the present absence of a recognized governing body, Section 1331 is nonetheless available to these plaintiffs as a jurisdictional basis for their claims.

By resting jurisdiction over these cases under 28 U.S.C. §§ 1331 and 1362, the Court does not intend to imply that jurisdiction is unavailable under the other asserted provisions. Rather, it does not find it necessary to make any determination with respect to those provisions since they would add nothing to the jurisdictional basis already provided.

11. The treaties relied upon by plaintiff in that action were the Treaty of Fort Stanwix of 1784, the Treaty of Fort Harmar of 1789, and the Treaty of Canandaigua of 1794.

session—was plainly enough alleged to be based on federal law.... Moreover, we think that the basis for petitioners' assertion that they had a federal right to possession governed wholly by federal law cannot be said to be so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy within the jurisdiction of the District Court, whatever may be the ultimate resolution of the federal issues on the merits.

*Supra,* 414 U.S. at 666, 94 S.Ct. 777.

The decision of the Court was clearly grounded upon its recognition of the fact that "[o]nce the United States was organized and the Constitution adopted, ... tribal rights to Indian lands became the exclusive province of federal law." *Supra,* 414 U.S. at 667, 94 S.Ct. 777.

The cases now before this Court involve pre-constitutional treaties, and probably the most crucial issue to be decided is whether during the Confederacy period, Indian interests in land within the boundaries of a State were already "the exclusive province of federal law." *Id.* However, the Court is of the opinion that the distinction does not deprive it of jurisdiction over these lawsuits.

Plaintiffs in these actions assert claims under the Constitution, federal treaties [12] and under the Nonintercourse Act in addition to their claims under the Articles of Confederation. Furthermore, it cannot be said that those claims are "so insubstantial, implausible, foreclosed by prior decision of [the Supreme Court] or otherwise completely devoid of merits as not to involve a federal controversy within the jurisdiction" of this Court. *Id.* at 666, 94 S.Ct. at 777. It is true that the language of Sections 1331

and 1362 does not provide jurisdiction for claims arising under the Articles of Confederation or laws passed by the Continental Congress. Nor did the Constitution save or create any cause of action for violations of the Articles. Therefore, it is arguable that there may be no independent federal jurisdictional basis for those claims.

■ However, even if defendants are correct in their assertion that claims under the Articles of Confederation and the Proclamation of 1783 may only be stated under State law, this Court has the authority and chooses to exercise pendent jurisdiction over those claims in the event that no independent federal jurisdiction can be found.[13] *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## JUSTICIABILITY

■ In order for these lawsuits to be decided on their merits, they must not only satisfy jurisdictional requirements but must also be found to be justiciable. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Sneaker Circus, Inc. v. Carter,* 566 F.2d 396, 401 (2d Cir. 1977). The defendants contend that the plaintiffs' claims are nonjusticiable, necessitating the dismissal of both complaints.

As recognized by the Supreme Court in *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968), "[j]usticiability is itself a concept of uncertain meaning and scope." However, in these cases the justiciability arguments are limited to three well recognized areas. First, the defendants assert that the plaintiffs are without standing. Second, they argue that "the claim[s] presented and the relief sought are [not] of the type which admit of judicial

---

**12.** The Constitution incorporated treaties made by the Federal government during the Confederacy period into "the supreme Law of the Land." U.S.Const., Art. VI. Therefore, plaintiffs' claim under the Treaty of Fort Stanwix of 1784 falls within the "arising under" jurisdiction of both §§ 1331 and 1362.

**13.** Defendants contend that any claim made under the Articles of Confederation would have

to be stated under State law since under the Articles, the Federal government, being for all practical purposes without its own judiciary, had to resort to State Courts for enforcement of its laws.

New York State did incorporate the Articles into its statutes on February 6, 1778. *Laws of New York,* Ch. 1 (1777–1784). Therefore, a claim for violation of the Articles could have been asserted under State law.

resolution." *Powell v. McCormack,* 395 U.S. 486, 516–17, 89 S.Ct. 1944, 1961, 23 L.Ed.2d 491 (1969). Third, the defendants claim that the issues raised in the lawsuits fall within the reach of the political question doctrine.

*Standing*

■ Defendants contend that the plaintiffs are without standing to assert or recover for claims which belonged to the original Oneida Indian Nation. When standing is challenged on a motion to dismiss, the Court is obliged to accept the factual allegations in the complaint and to construe the complaint in the light most favorable to the complaining party. *See Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

■ Plaintiffs in these actions have alleged that they are "successors in interest" to the original Oneida Indian Nation, and it is this portrayal of their status which defendants assert leaves them without standing. Defendants claim that in order to recover under the Nonintercourse Act, a plaintiff tribe must establish that it has been a tribe at all relevant times,[14] *see Mashpee Tribe v. New Seabury Corp., supra,* and mere "successors in interest" do not, according to defendants, satisfy that requirement.

Defendants, however, overlook the fact that in addition to claiming "successor in interest" status, plaintiffs allege that they constituted the Oneida Nation at the time of the acts complained of, and more importantly claim that they have continuously maintained tribal relations up until the present. Although if the actions were to survive, plaintiffs in both actions would ultimately be put to their proof on their right to recovery, the Court is convinced that they have at this point alleged a sufficient interest to give them standing to proceed on their claims and denies defendants' request for dismissal on that basis. *See Oneida Indian Nation v. County of Oneida, supra,* 434 F.Supp. at 532–33.

*Appropriateness of Judicial Resolution*

■ In deciding whether the claims for relief are appropriate for judicial resolution, the Court must determine whether "the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker v. Carr, supra,* 369 U.S. at 198, 82 S.Ct. at 700.

■ Defendants assert that the claims raised in these actions are nonjusticiable—cannot be judicially determined by this Court—because the justness of the extinguishment of the Oneida Indian Nation's aboriginal title by the Treaties with New York State in 1785 and 1788 is not open to inquiry by the judiciary.[15] The defendants reach this conclusion through reliance on the doctrine of discovery and an attack on the alleged authority of the federal government under the Articles of Confederation.

Defendants begin their argument by pointing out that had the extinguishment of title been accomplished by the United States Congress under the Constitution, this Court would unquestionably be precluded from inquiring into the fairness of the transactions. The defendants find support for their position in *United States v. Santa*

---

**14.** The Court has been unable to uncover any prior instance of a Court having occasion to address the question of whether the same showing of tribal continuity would be required for recovery on claims arising under the Articles of Confederation. Presumably some showing of entitlement to recover on claims originally belonging to a past generation would be required.

**15.** It is suggested in the joint memorandum of law submitted by the Counties and Ryan in support of the defendants' motion to dismiss that:

> [n]otwithstanding the length and ingenuity of the plaintiffs' complaints, the duty they purport to assert may be stated relatively, if deceptively, simply: the extinguishment of Indian title based on aboriginal possession must be just.
>
> The Court disagrees with what it believes to be a gross oversimplification of the issues raised in these lawsuits. While an initial reaction to the historical facts presented might be to question the fairness or lack thereof in the treatment of the Oneida Indian Nation, more crucial to these cases is the issue of who had the authority during the period in question to treat with them at all.

*Fe Pacific Ry. Co.*, 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941), in which Justice Douglas writing for the Court stated that:

> Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme. The manner, method and time of such extinguishment raise political not justiciable issues... As stated by Chief Marshall in *Johnson v. M'Intosh*, [21 U.S. (8 Wheat.) 543, 586, 5 L.Ed. 681 (1823)] "the exclusive right of the United States to extinguish" Indian title has never been doubted. And whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts.

*See also Beecher v. Wetherby*, 95 U.S. 517, 525, 24 L.Ed. 440 (1877); *United States v. Gemmill*, 535 F.2d 1145, 1147 (9th Cir. 1976), *cert. denied sub nom. Wilson v. United States*, 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976).

According to the defendants, under the doctrine of discovery, New York had that same absolute right to extinguish Indian title at the time of the Treaties of 1785 and 1788. The concept of extinguishment of aboriginal title arises out of the doctrine of discovery which was adopted by the Supreme Court long ago both to explain and justify its determination as to the Indian tribes' and the European discoverers' respective interests in the land which the Indians occupied at the time of the "discovery" of what is now the United States.

The case of *Johnson v. McIntosh, supra* presented the first instance in which it was necessary for the Court to delineate the rights attaching to the Indians' interest in the land they inhabited. The plaintiffs in that case claimed title to land under a grant from the Chiefs of two Indian tribes. The question before the Court was whether the Indians had fee title to the land, which would be recognized in the Courts of the United States and which could be conveyed to others.

Chief Justice Marshall, relying on the doctrine of discovery concluded that the Indians had less than a fee simple interest in the land. Explaining his decision the Chief Justice wrote that:

> On the discovery of this immense continent, the great nations of Europe were eager to appropriate to themselves so much of it as they could respectively acquire. Its vast extent offered an ample field to the ambition and enterprise of all; and the character and religion of its inhabitants afforded an apology for considering them as a people over whom the superior genius of Europe might claim an ascendancy. The potentates of the old world found no difficulty in convincing themselves, that they made ample compensation to the inhabitants of the new, by bestowing on them · civilization and Christianity, in exchange for unlimited independence. But as they were all in pursuit of nearly the same object, it was necessary, in order to avoid conflicting settlements, and consequent war with each other, to establish a principle, which all should acknowledge as the law by which the right of acquisition, which they all asserted, should be regulated, as between themselves. This principle was, that discovery gave title to the government by whose subject, or by whose authority, it was made, against all other European governments, which title might be consummated by possession . . . . Those relations which were to exist between the discoverer and the natives, were to be regulated by themselves. The rights thus acquired being exclusive, no other power could interpose between them.
>
> In the establishment of these relations, the rights of the original inhabitants were, in no instance, entirely disregarded; but were, necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as a just claim to retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished and their power to dispose of the soil, at their

own will, to whomever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it. While the different nations of Europe respected the right of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in possession of the natives. These grants have been understood by all, to convey a title to the grantees subject only to the Indian right of occupancy.[16]

*Supra*, 21 U.S. at 572–74.

Thus, as recently stated by the Supreme Court in *Oneida Indian Nation v. County of Oneida, supra*, 414 U.S. at 667, 94 S.Ct. 777:

[i]t very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original states and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act.

Defendants allege that in 1785 and 1788 when the challenged treaties were entered into, New York State was the sovereign in the sense used by the Supreme Court. Prior to the American Revolution Great Britain as discovering sovereign had the sole authority to extinguish the Indians' possessory interest in their land. However, as explained by Chief Justice Marshall in *Johnson v. McIntosh, supra*, 21 U.S. at 584–85:

By the treaty which concluded the war of our revolution, Great Britain relinquished all claim, not only to the government, but to the "proprietary and territorial rights of the United States," whose boundaries were fixed in the second article. By this treaty, the powers of government, and the right to soil, which had previously been in Great Britain, passed definitively to these states.... It has never been doubted, that either the United States, or the several states, had a clear title to all the lands within the boundary lines described in the treaty, subject only to the Indian right of occupancy, and that the exclusive power to extinguish that right, was vested in that government which might constitutionally exercise it.

Despite the Chief Justice's uncertainty on the issue of whether the several states or the federal government had the exclusive right to extinguish Indian title to land located within the states during the Confederacy period, the defendants assert that the power clearly belonged to the states under the Articles of Confederation, and that this Court may not now question the exercise of that power.

It will be recalled, that one of, if not the basic premise relied upon by plaintiffs in these lawsuits is the assertion that under the Articles of Confederation the federal government had the sole and exclusive authority to extinguish Indian title to land located within the geographical limitations of the states. While plaintiffs' position will be more fully addressed at a later point in this decision, it is important at this juncture to recognize the existence of a serious controversy which must be resolved before this Court is even in a position to determine whether or not it may inquire into the justness of the State's actions with respect to the Treaties of 1785 and 1788.

This particular aspect of defendants' justiciability argument does not go to the

---

**16.** In one recent commentary on the subject of aboriginal title, the author referring to Chief Justice Marshall's decision to use the discovery doctrine, wrote that:

As Professor Cohen [Felix Cohen, author of *Handbook of Federal Indian Law* (1942)] has pointed out, the doctrine protected Indian rights to their aboriginal land without invalidating the government grants to which so many Americans traced their title. As such, it represents a brilliant compromise, providing the analytical framework to uphold the validity of sovereign grants of aboriginal land while giving substance to Indian or aboriginal title.

Newton, *At the Whim of the Sovereign: Aboriginal Title Revisited*, 31 Hastings L.J. 1215, 1223 (1979–80).

Court's authority to determine the controversy over the allocation of powers under the Articles of Confederation. The Court should not conclude that these actions should be dismissed on justiciability grounds because the resolution of certain issues one way or the other might place before it issues which it later may be precluded from deciding on those grounds. In fact, the Court is obligated to go as far as it properly can in the exercise of its jurisdiction over those issues which are found to be justiciable.[17] The possibility that the justness of the 1785 and 1788 Treaties will ultimately be found to present a nonjusticiable issue cannot prevent the Court's legitimate exercise of its jurisdiction.

 Nor does the second aspect of defendants' justiciability argument, that relief cannot be judicially molded, warrant dismissal of these actions. Defendants suggest, probably with complete accuracy, that an award of possession of over five million acres of land in New York State to the plaintiffs in these cases would create utter chaos and disaster to many, socially, economically and politically.

In fact, the defendants go so far as to claim that the Court would be unable to even successfully fashion an order granting such relief, adding that if it did attempt to do so that it would have to "establish itself by judicial fiat as a kind of transitional government and appoint its officers as unelected vice-regents to manage a transfer which could take years." (Memorandum of Law in support of defendants' motion to dismiss submitted by the Counties and Ryan at p. 32). Even if the Court was to treat plaintiffs' claim for the fair rental value as an alternative claim for money damages, the amount, if it could be determined at all, would according to the defendants, be staggering, and execution of such a judgment

would result in personal, business and municipal defaults.

Responding to the defendants argument, the plaintiffs point out that in addition to seeking injunctive and damages relief they are asking the Court for a declaration of their rights with respect to the subject lands. The plaintiffs contend that they should be allowed to pursue their claim for declaratory relief even if for some reason the Court is unable to fashion any further relief in these actions. The Court agrees.

In *Powell v. McCormack, supra,* elected Representative Adam Clayton Powell and certain of his constituents commenced suit for declaratory, injunctive and mandatory relief challenging a Congressional resolution barring his seating in the House on the grounds of alleged misconduct. The defendants in that case, the Speaker of the House and various House officials and employees, sought dismissal on justiciability grounds, arguing among other things that the molding of effective relief was impossible in the face of the Speech and Debate Clause of the Constitution. That provision allegedly left the Court without authority to issue coercive relief, including mandamus and injunctive relief, compelling officers or employees of the House to act.

Justice Douglas, writing for the Court, noted that Powell had sought declaratory as well as coercive relief, and found that the District Court would have been empowered to issue declaratory relief "whether or not further relief [was] or could be sought." 28 U.S.C. § 2201 quoted *supra,* 395 U.S. at 517, 89 S.Ct. 1962. According to Justice Douglas:

> [T]he availability of declaratory relief depends on whether there is a live dispute between the parties, (citation omitted), and a request for declaratory relief may be considered independently of whether other forms of relief are appropriate.

---

**17.** *See e. g., Orlando v. Laird,* 443 F.2d 1039 (2d Cir.), *cert. denied* 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971), an action brought by servicemen challenging the constitutional authority of the executive branch to wage a war in Vietnam, in which the Court found that while the question of whether or not Congress was required to take some action to authorize the war was justiciable, the question of the constitutional propriety of the means chosen by Congress to do so presented a nonjusticiable political question. *See also Holtzman v. Schlesinger,* 484 F.2d 1307 (2d Cir. 1973), *cert. denied* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974).

*Supra* at 518, 89 S.Ct. at 1962. Therefore, plaintiffs in these cases should be given the opportunity to pursue their request for declaratory relief.

The foregoing should not be interpreted as a finding by this Court that no relief other than a declaratory judgment could be awarded to the plaintiffs were they to ultimately succeed on the merits in these cases. While the question of appropriate relief need not be resolved at this point, it is unlikely that relief would be so limited.

The Court, however, is keenly aware of the serious, if not insurmountable, problems which would arise out of granting the plaintiffs the relief they seek. Furthermore, it is not blind to the fact that plaintiffs are asking for the return of land which has been highly developed since it was last inhabited by the members of the Oneida Indian Nation, and that is certainly a factor which would merit consideration in the formulation of a remedy in these cases.[18]

There is no question but that these cases present claims which should long ago have been resolved in a legislative forum rather than in a court of law. Unfortunately, neither the State of New York nor the federal government has shown much inclination to do so thus far.[19]

As Judge Port stated in his decision in *Oneida Indian Nation v. County of Oneida, supra,* 434 F.Supp. at 531–32:

**18.** Plaintiffs no doubt might look at this from a different perspective. It can hardly be disputed that development of the land to its present state has had a detrimental effect on its use for hunting and fishing.

**19.** Congress has not been entirely inactive, having in the past established the Indian Claims Commission in order to provide a forum in which Indian tribes could claim monetary damages against the United States in cases arising out of specified aspects of the dealings and relationship between the tribes and the federal government. Aug. 13, 1946, c. 959, 60 Stat. 1049, codified at 25 U.S.C. §§ 70 *et seq.*

The Indian Claims Commission was dissolved by Congress in 1978 with provision made for cases then pending before it to be transferred to the Court of Claims. 25 U.S.C. § 70v *et seq.* The Oneida Indian Nation has met with some success in pursuing claims before the Commis-

The greater part of the disruption and individual hardships caused by litigation such as this could be avoided by seeking solutions through the other available vehicles. This in no way is intended to be critical of the plaintiffs' conduct. The trial of this case demonstrated that they have patiently for many years sought a remedy by other means—but to no avail.... The aptness of what was recently said by Chief Judge Kaufman is striking. "As in so many cases in which a political solution is preferable, the parties find themselves in a court of law." *British Airways Board v. Port Authority of New York and New Jersey,* 558 F.2d 75 at 78 (2d Cir. 1977).

■ However, even though the molding of relief in these cases would present difficult problems for this or any Court, the difficulties are unlike the barriers usually found to preclude the granting of a specific type of relief. For example, in *Powell v. McCormack, supra,* the challenge to the Court's authority to issue mandatory and injunctive relief did not go to the consequences of doing so, but to the actual power of the Court to act in light of the Speech and Debate Clause.

In a somewhat different type of situation, a Court may be unable to fashion a remedy simply because there are no adequate or reliable standards to rely on in deciding what might be an appropriate resolution to the problem involved.[20] While

sion, including one claim relating to the same transactions now before this Court. *See Oneida Indian Nation of New York v. United States,* 37 Ind.Cl.Comm. 522, aff'd. 576 F.2d 870 (Ct.Cl. 1978).

**20.** For instance, in *Ad Hoc Committee on Jud. Admin. v. Commonwealth,* 488 F.2d 1241 (1st Cir. 1973) *cert. denied* 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974), a group of attorneys brought suit against the State of Massachusetts under 42 U.S.C. § 1983 to compel the furnishing of additional State Court facilities, to force the establishment of proposals for dealing with Court congestion and to implement new programs designed to alleviate the problem. The Court found that it would be hard put to fashion a remedy which it could be at all certain would help solve the congestion problem since there did not seem to be any reliable standards or guidance available to it and refused the case on justiciability grounds.

Indian land claim cases tend to defy the application of any traditional label, they are not unlike ejectment actions, and the Courts in the past have had little problem in fashioning remedies in such cases. Clearly, there are considerations in these cases which are not normally present in ejectment actions. Nonetheless, there are standards available which could in all likelihood serve as a basis for the formulation of a remedy which would ultimately have to be based upon the considerations and the equities lying with both sides to these lawsuits.

*Political Question Doctrine*

 Finally, the defendants claim that these actions are barred under the political question doctrine. It is well established that federal courts will not decide political questions. *See Baker v. Carr, supra; Powell v. McCormack, supra; Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). However, the exact contours of the doctrine are unclear, and determinations have traditionally been made on a case by case basis. *Baker v. Carr, supra.*

The doctrine has been identified as "essentially a function of the separation of powers." *Baker v. Carr, supra*, 369 U.S. at 217, 82 S.Ct. at 710. *See also Olegario v. United States*, 629 F.2d 204, 216 (2d Cir. 1980) *cert. denied*, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). However, the Supreme Court has also acknowledged that the doctrine is at least in part a recognition of the inherent limitations on the judiciary. *Coleman v. Miller, supra; Luther v. Borden*, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849); *Occ of Umm al Qaywayn v. A Certain Cargo, Etc.*, 577 F.2d 1196, 1203 (5th Cir. 1978), *cert. denied* 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979).

In *Baker v. Carr, supra*, 369 U.S. at 217, 82 S.Ct. at 710, Justice Brennan, writing for the Court, attempted to formulate a list of criteria to be considered in determining the presence of a political question, and concluded that:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence.

*See also Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (Concurring opinion of Justice Powell).

The defendants claim that these cases present political questions under the first three formulations set forth by Justice Brennan. The Court disagrees and declines to dismiss the actions on that ground.

 Defendants first contend that the Court's authority to determine these plaintiffs' right to relief is limited under the political question doctrine as the result of a textual commitment of power to Congress. The defendants point out that there are disagreements among the various alleged successors in interest to the aboriginal land of the original Oneida Indian Nation. According to the defendants, the judiciary is required to initially defer to Congressional determinations with respect to the rights of the various claimants and the distribution of tribal property because there has been a clear textual commitment of those issues to Congress under Art. I, Sec. 8, Cl. 3 of the United States Constitution which gives that branch of government the power "[t]o regulate commerce with the Indian tribes."[21]

---

21. Defendants also suggest that a decision by this Court granting relief to any of the plaintiffs as successors in interest to the original Oneida

Indian Nation would constitute a "conveyance" of lands from the original tribe to the plaintiffs in violation of the Nonintercourse Act. De-

The defendants' argument is based upon the decision of the Supreme Court in *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1976). The Court, however, does not find that case dispositive. The *Delaware* case involved a challenge to a Congressional determination respecting the disbursement of funds awarded by the Indian Claims Commission. The award had been made to the Delaware Indians, and the suit was commenced by a group of Delawares who had been excluded from recovery. Two groups of Delawares who were recipients under the Congressional Act argued that the suit presented a nonjusticiable political question based upon the authority of Congress to control tribal property.

The Court found that "[t]he power of Congress over Indian affairs may be of a plenary nature; but it is not absolute." *Id.* at 84, 97 S.Ct. 919, quoting from *United States v. Alcea Band of Tillamooks*, 329 U.S. 40, 54, 67 S.Ct. 167, 174, 91 L.Ed. 29 (1946) (plurality opinion). While conceding that as a general rule the judiciary was required to defer to Congress in determinations as to the best use of tribal funds, the Court recognized the existence of judicial authority to review those Congressional determinations and did so in that case.

If the plaintiffs were to ultimately prevail on the merits in these cases, it is not inconceivable that the Court might be required to defer to Congressional determinations with respect to the distribution of any relief granted. At that point the Supreme Court decision in the *Delaware* case might have some direct relevance to these lawsuits. For the present the Court finds little or none.

This Court has found no instance in which an Indian land claim case has been dismissed on justiciability grounds [22] and is not convinced that the claims raised by these plaintiffs present any political questions requiring dismissal by virtue of the authority granted Congress under the Constitution. The plaintiffs in these lawsuits are asking the Court to construe various provisions of the Articles of Confederation, to interpret treaties entered into between the United States and the Six Nations, and New York State and the Oneida Indian Nation, and to determine the applicability of the Nonintercourse Act with respect to the subject land. Clearly, none of the above constitutes a usurpation of the authority granted Congress under the Constitution.

In *Wharton v. Wise*, 153 U.S. 155, 14 S.Ct. 783, 38 L.Ed. 669 (1894) the Supreme Court did not hesitate to assume the task of interpreting Article VI of the Articles of Confederation, and in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), while the Court found it unnecessary to interpret the Articles, it in no way suggested that it would be without authority to do so.

Interpretation of treaties between the United States and the Indian tribes has long been recognized as a judicial function. *See e. g. State of Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed. 493 (1981); *Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 67 S.Ct. 650, 91 L.Ed. 823 (1947); *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943).

Finally, as pointed out by the Court in *Narragansett Tribe of Indians v. Southern Rhode Island Development Corp., supra* at 815, Courts are not precluded from determining the applicability of the Nonintercourse Act since "[j]udicial construction and

---

fendants claim that in enacting that statute, Congress reserved to itself the sole authority to control such conveyances.

The Court is not convinced that this raises a legitimate political question argument. If plaintiffs were ultimately found to be correct in their claims, the 1785 and 1788 Treaties would be declared void, thus leading to the conclusion that the Oneida Nation has at all times since been entitled to possession of the subject land.

If plaintiffs then satisfied all of the other entitlement requirements, they would be the rightful possessors of the land without an actual "conveyance" by this Court.

22. Commentators have, however, suggested that the determination of Indian land claims is not a proper judicial function. *See e. g.* Comment, "Indian Land Claims under the Nonintercourse Act", 44 Albany L.Rev. 110, 131–32 (1979).

implementation of a statute passed by Congress surely cannot constitute interference with powers committed by the Constitution to Congress." *See also Mohegan Tribe v. State of Connecticut, supra* (Second Circuit deciding a question concerning the coverage of the Nonintercourse Act).

■ Defendants assert next that the actions involve solely political questions because of a lack of judicially manageable standards for resolving them. This argument includes in part a repetition of the claim that this Court is precluded from adjudicating the justness of New York's extinguishment of the Oneida's aboriginal title. Having already addressed that argument, the Court need not do so again. However, the defendants also raise a new claim which involves allegations of both a lack of judicially manageable standards and a textual commitment to a coordinate political branch.

■ The defendants argue that Congress, in the exercise of its constitutional authority over the Indian tribes, has delegated the sole power to remedy violations of Indian land rights to the executive branch. Defendants find that asserted allegation in 25 U.S.C. § 180 which provides that:

> Every person who makes a settlement on any lands belonging, secured, or granted by treaty with the United States to any Indian tribe, or surveys or attempts to survey such lands, or to designate any of the boundaries by marking trees, or otherwise, is liable to a penalty of $1,000. The President may, moreover, take such measures and employ such military force as he may judge necessary to remove any such person from the lands.

Without offering any direct authority for their position with respect to 25 U.S.C. § 180, defendants suggest that since Congress has, pursuant to its Art. I powers, delegated to the executive the remedial discretion to deal with violations of Indian

lands rights, a lawsuit seeking relief for those same violations presents nonjusticiable political questions.

The defendants do rely on the decision of the Supreme Court in *Luther v. Borden, supra* for support of the general proposition that once the executive has been given discretion to act or not act in a given situation, courts may not do so. However, this Court finds that case easily distinguishable from the present actions.

The Court in *Luther* was asked to decide which of two competing governments was the legitimate government of the State of Rhode Island. It declined to do so on political question grounds, after concluding that determination of the legitimacy of a State government was textually committed to Congress by the Guaranty Clause of the Constitution.[23] Writing for the Court, Chief Justice Taney explained that:

> Under [Art. 4, Sec. 4] of the Constitution it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not.... And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal....

> So, too, as relates to the clause in the abovementioned article of the Constitution, providing for cases of domestic violence. It rested with Congress, too, to determine upon the means proper to be adopted to fulfil this guarantee. They might, if they had deemed it most advisable to do so, have placed it in the power of a court to decide when the contingency had happened which required the federal government to interfere. But Congress thought otherwise, and no doubt wisely; and by the act of February 28, 1975, provided, that, "in case of an insurrection

---

**23.** The Court's decision was also based at least in part on its recognition of the significant measure of chaos which would have resulted from a finding that the charter government which had been in operation was without legal

existence, and on the fact that the State Courts of Rhode Island had not recognized the issue of which was the legitimate State government as a justiciable one.

in any State against the government thereof, it shall be lawful for the President of the United States, on application of the legislature of such State or of the executive (when the legislature cannot be convened), to call forth such number of the militia of any other State or States, as may be applied for, as he may judge sufficient to suppress such insurrection."

By this act, the power of deciding whether the exigency had arisen upon which the government of the United States is bound to interfere, is given to the President ... he must determine what body of men constitute the legislature, and who is the governor, before he can act.... If there is an armed conflict, like the one of which we are speaking, it is a case of domestic violence, and one of the parties must be in insurrection against the lawful government. And the President must, of necessity, decide which is the government, and which party is unlawfully arrayed against it, before he can perform the duty imposed upon him by the Act of Congress.

*Supra* 48 U.S. at 42–44.

The President had not called out the militia, but he had, on application of the charter governor of Rhode Island, recognized him as the executive of the State and took measures to arrange for the militia to be called out if necessary. The Court's decision with regard to executive action might, as defendants seem to suggest, be looked at merely as an extension of its textual commitment determination made with respect to the Guaranty Clause, since the executive authority clearly arose from the exercise of Congressional power under that provision. However, that does not appear to be a completely accurate analysis of the Court's decision. Rather, the Court appeared to recognize that as a result of the executive actions there was "an unusual need for unquestioning adherence to a political decision already made." *Baker v. Carr, supra*,

369 U.S. at 217, 82 S.Ct. 710.[24] There is no such need in this case, and the decision in *Luther* is not controlling.

As defendants point out, the Department of the Interior has thus far declined to commence actions challenging the 1785 and 1788 Treaties on behalf of the plaintiffs, so at this point there is no serious risk of conflict as in *Luther*. Furthermore, defendants have not shown any indication of a Congressional intent to limit the Indians' rights to protect their own rights in land as the defendants seem to suggest was intended by 25 U.S.C. § 180. Therefore, the Court does not find these cases to be nonjusticiable by virtue of the grant of executive authority contained in that section.

■ For their final political question doctrine argument, defendants claim that the Court should find these cases to be nonjusticiable because it is impossible to decide them "without an initial policy determination of the kind clearly for nonjudicial discretion." *Baker v. Carr, supra*, 369 U.S. at 217, 82 S.Ct. 710.

First, the defendants point out that there are those among their number with legitimate needs and rights which are as meritorious as plaintiffs. They include in that group the poor, the elderly, the mentally and physically disabled dependent upon the government for their sustenance, and indirectly the taxpayer.

Defendants also stress that any wrong done was done to a political entity which they allege no longer exists, under a government which no longer exists at a time before this Court came into being. The defendants argue that in order to decide these cases, the Court must make several policy decisions of a kind for nonjudicial discretion, including determining that the plaintiffs are the proper parties, deciding that New York had a pre-constitutional legal duty enforceable by the present plain-

---

**24.** This interpretation receives some support in the decision in *Baker v. Carr, supra*, 369 U.S. at 222, 82 S.Ct. 712, where in discussing the *Luther* case, the Court stated that:

[C]learly, several factors were thought by the Court in *Luther* to make the question

there "political": ... the unambiguous action by the President, in recognizing the charter government as the lawful authority [and] the need for finality in the executive's decision.

tiffs, and choosing who shall bear the burden of providing relief should plaintiffs prevail.

Plaintiffs contend, and the Court agrees that the defendants are attempting to extend the reach of the "initial policy determination" formulation beyond its intended reach. The question of whether the plaintiffs are the proper parties is an issue which, as previously explained, is to be resolved whenever possible through acceptance of executive determinations of tribal status.[25]

Resolution of the question of whether New York State had a pre-constitutional duty enforceable by these plaintiffs does not require a policy determination but rather construction of the Articles of Confederation, and a legal decision as to whether these particular plaintiffs are the proper beneficiaries. Finally, while the Court agrees that a determination as to who should bear the burden of providing relief should plaintiffs prevail involves certain policy determinations, they are not necessarily of the type for nonjudicial discretion. In light of the foregoing the Court declines to dismiss these actions based on defendants' policy determination argument.

## ELEVENTH AMENDMENT

The State defendants have moved for dismissal of these actions against the State of New York, its officials, agencies and authorities on Eleventh Amendment grounds. The Court finds, however, that the Eleventh Amendment does not constitute a bar and, therefore, denies the State's motion.

 The Eleventh Amendment to the United States Constitution provides that:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Although the amendment cannot literally be construed to apply to suits brought by a State's own citizens, it has long been established that an unconsenting State is immune from such suits as well. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The amendment has also been found to bar suits by a foreign sovereign against one of the States. *Monaco v. Mississippi*, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1933).

 It is clear, however, that the States' Eleventh Amendment immunity may be set aside by Congress acting pursuant to the authority delegated to it by the States under the United States Constitution. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 451–56, 96 S.Ct. 2666, 2669–2671, 49 L.Ed.2d 614 (1976); *Parden v. Terminal Railroad Co.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Plaintiffs contend, and the Court agrees that Congress has intentionally abrogated the Eleventh Amendment immunity of the States in lawsuits brought by Indian tribes under 28 U.S.C. § 1362 to protect and enforce alleged tribal property rights. A review of the major Supreme Court cases addressing the issue of Congressional abrogation of the States' sovereign immunity supports this Court's analysis of the question in the present situation.

In *Parden v. Terminal Railroad Co.*, supra, employees brought a personal injury action under the Federal Employees Liability Act (FELA), 45 U.S.C. §§ 51–60, seeking damages against a State-owned railroad. The defendant sought and was denied dismissal on Eleventh Amendment grounds.

The Court reasoned that since the statutory language extended to "every" interstate railroad, it followed that in enacting the FELA Congress intended to reach State-owned railroads as well as private.

---

**25.** There have been Indian land claim cases brought under the Nonintercourse Act where no affirmative decision vis-a-vis the plaintiff tribe had ever been made either by Congress or the Department of the Interior. *See e. g. Joint Tribal Counsel of the Passamaquoddy Tribe v. Morton, supra; Narragansett Tribe of Indians v. Southern Rhode Island Development Corp., supra.*

In the *Narragansett* case, the Court found that it had the authority to determine the question of tribal status for purposes of a claim under the Act.

*Supra* at 187–88, 84 S.Ct. 1210. Having resolved the question of statutory intent, the Court went on to consider whether Congress had the constitutional power to abrogate the States' Eleventh Amendment immunity in this area. In resolving this inquiry, the Court found that in granting Congress the power to regulate commerce under the Commerce Clause of Art. I, § 8 of the Constitution, "the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation." *Supra* at 192, 84 S.Ct. 1212. Therefore, in enacting the FELA pursuant to the authority granted it in the Commerce Clause, Congress had the power to bring the States within the coverage of the Act.

However, the Court did not end its analysis at that point, adding that:

> Recognition of the congressional power to render a State suable under the FELA does not mean that the immunity doctrine, as embodied in the Eleventh Amendment with respect to citizens of other States and as extended to the State's own citizens by the *Hans* case, is here being overridden. It remains the law that a state may not be sued by an individual without its consent.

*Supra* at 192, 84 S.Ct. 1212. Thus, the Court found that even though Congress had intended to abrogate the States' immunity, State consent to the waiver of their sovereign immunity was required. The Court in *Parden* found an implied consent in the State's decision to operate a railroad after Congress had made "every" railroad subject to suit under the FELA.

Four dissenting Justices argued that compulsory waiver of Eleventh Amendment rights should be inferred only when the intent to do so is clearly expressed by Congress. This restrictive view was apparently adopted by the majority in *Employees v. Missouri Public Health Dept.*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) where the Court finding that the action was barred by the Eleventh Amendment, stressed that:

> [i]t is not easy to infer that Congress in legislating pursuant to the Commerce Clause, which has grown to vast proportions in its applications, desired silently to deprive the States of an immunity they have long enjoyed under another part of the Constitution.

*Id.* at 285, 93 S.Ct. 1618.

At issue in *Employees* was whether enactment of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–19, was intended to override the States' Eleventh Amendment immunity to private suits seeking overtime compensation. In holding that FLSA did not reach that far, the Court noted that unlike *Parden* which dealt with a profit-making business generally operated by private persons and corporations, *Employees* involved State hospitals and schools normally operated on a non-profit basis. The Court also recognized the massive number of employees who would be affected in *Employees* as opposed to a more limited number in *Parden*.

Finally, the Court recognized the distinction in the remedies available under the two federal statutory schemes. In *Parden* the Court had stressed that if suits against the State under the FELA were barred by the Eleventh Amendment, the railroad employees would be left with a right for which there was no remedy whatsoever. That was not so in *Employees* since under the FLSA the Secretary of Labor could act against a State to enforce the provisions of the Act even though the employees themselves were precluded from direct action. Furthermore, the FLSA unlike the FELA provided for double recovery in actions brought by employees. The Court found it difficult to accept that Congress would have intended to expose the States to double liability without more specifically saying so. *Id.* 411 U.S. at 284–85, 93 S.Ct. 1617–18.

The issue of Congressional abrogation of the States' sovereign immunity was again before the Supreme Court in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In *Edelman*, a class of plaintiffs alleged that the State's processing of welfare benefit applications violated federal regulations under the Social Security Act. The Court, while upholding a lower Court award of prospective injunctive relief, found that the Eleventh Amendment

barred retroactive payment of wrongfully withheld benefits.

*Edelman* was distinguished from *Parden* and *Employees* in that both of those cases:

involved a congressional enactment which by its terms authorized suit by designated plaintiffs against a general class of defendants which literally included States or state instrumentalities. . . . The question of waiver or consent under the Eleventh Amendment was found in those cases to turn on whether Congress had intended to abrogate the immunity in question, and whether the State by its participation in the program authorized by Congress had in effect consented to the abrogation of that immunity.

But in this case the threshold fact of congressional authorization to sue a class of defendants which literally includes States is wholly absent. . . .

The Court of Appeals held that as a matter of federal law Illinois had "constructively consented" to this suit by participating in the federal AABD program and agreeing to administer federal and state funds in compliance with federal law. *Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here. In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171 (1909). [emphasis added]

*Id.* 415 U.S. at 672–73, 94 S.Ct. 1360.

While the Court in *Edelman* still recognized the need for State consent in addition to a clear indication of Congressional intent to abrogate that immunity, it has been suggested that the decision "strongly implies that Congress can force a constructive consent by a state whenever Congress specifically authorizes private actions against the state." *Peel v. Florida Dept. of Transp.,* 600 F.2d 1070, 1077 (5th Cir. 1979). *See also*

*Jennings v. Illinois Office of Ed.,* 589 F.2d 935 (7th Cir. 1979), *cert. denied* 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979).

In *Fitzpatrick v. Bitzer, supra,* the Court found the threshold fact of Congressional intent which was missing in *Edelman.* The plaintiffs in *Fitzpatrick* were present and retired male employees of the State of Connecticut who brought an action alleging that the State retirement plan discriminated against them in violation of Title VII, 42 U.S.C. § 2000e *et seq.* The plaintiffs sought retroactive benefits, presenting the Court with the question of whether such relief was barred by the Eleventh Amendment.

The Court concluded that the language of Title VII demonstrated a clear intent on the part of Congress to include the States within its coverage. However, the Court recognized that unlike the statute in *Parden,* which had involved Congressional action under the Commerce Clause, the relevant portions of Title VII had been enacted pursuant to Congress' authority under the provisions of § 5 of the Fourteenth Amendment. Therefore, it had to determine whether Congress had the same authority to abrogate the States' sovereign immunity under the Fourteenth Amendment as it did when acting pursuant to its powers under the Commerce Clause. Justice Rehnquist, writing for the Court concluded that Congress may

in determining what is "appropriate legislation" for the purpose of enforcing provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts.

*Fitzpatrick, supra,* 427 U.S. at 456, 96 S.Ct. 2671.

The Court's conclusion was based upon its finding that "the Eleventh Amendment, and the principles of state sovereignty which it embodies, (citation omitted), are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment" since "[i]n that section Congress is expressly granted authority to enforce . . . the substantive provisions of the Fourteenth Amendment, which themselves em-

body significant limitations on state authority." *Fitzpatrick, supra* at 456, 96 S.Ct. 2671.

*Fitzpatrick v. Bitzer* was the first case in which the Supreme Court did not specifically require either State consent to suit or waiver of immunity. However, whether the need for such a showing is negated only in cases involving Congressional action pursuant to section 5 of the Fourteenth Amendment, is a question which has yet to be answered by the Supreme Court, and which presents an issue which must be addressed by this Court at a later point in this discussion.

*Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), a sequel to *Edelman* raised the issue whether the Eleventh Amendment prevented issuance of a federal court order directing that notice of the availability of administrative relief be sent to individuals who had been wrongfully deprived of welfare benefits.[26] In a dissenting opinion in *Edelman,* Justice Marshall assumed the position that "Congress authorized and the State consented to § 1983 actions in which the relief might otherwise be questioned on Eleventh Amendment grounds." *Edelman, supra,* 415 U.S. at 694, 94 S.Ct. 1371. In *Quern* the majority addressed this argument and concluded that § 1983, enacted by Congress pursuant to its § 5 Fourteenth Amendment powers, did not constitute an abrogation of the States' Eleventh Amendment immunity.

Comparing § 1983 to the statutes involved in *Fitzpatrick* and *Hutto,* the Court found that:

§ 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States.

*Id.* 440 U.S. at 345, 99 S.Ct. 1147. Because the Court decided that § 1983 was not meant as an abrogation of the immunity of the States, it was unnecessary to reach the issue of consent.

The primary importance of the *Quern* decision in this litigation is the fact that it demonstrates that the Supreme Court still adheres to the clear language requirement which may be satisfied either by explicit statutory language or unmistakable Congressional intent apparent in the legislative history of the enactment.

Plaintiffs in these cases claim that Congress in enacting 28 U.S.C. § 1362, intended to abrogate the States' sovereign immunity in actions brought by Indian tribes concerning property rights in aboriginal lands. Section 1362, enacted by Congress under the authority granted it in Art. I, § 8, Cl. 3 of the Constitution provides that:

[t]he district court shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws or treaties of the United States.

The *Hutto* case, however, adds little to the Court's analysis of the abrogation question because when confronted with the argument that more express statutory language abrogating immunity should be required, the Court pointed out that unlike the other cases which had concerned retroactive liability for prelitigation conduct, *Hutto* involved expenses incurred during the course of litigation. Courts have generally been recognized as having the authority to allocate the costs of litigation even among the States, thus justifying the Court's finding that section 1988 was applicable to the States even "in the absence of an extraordinarily explicit statutory mandate." *Id.* 437 U.S. 695, 98 S.Ct. 2576.

---

**26.** In between *Edelman* and *Quern* the Supreme Court decided *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), *reh. denied* 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 803 (1979), an action in which the State defendant challenged an award of attorney's fees made pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, on Eleventh Amendment grounds. Relying both on the statutory language extending coverage to "any" action brought to enforce certain civil rights and legislative history documenting Congress' intention to include the States within the Act's coverage, the Court concluded that Congress had intended the Act to apply to the States thus abrogating their Eleventh Amendment immunity.

*Congressional Intent*

In analyzing plaintiffs' position, the Court must first determine whether in enacting § 1362 Congress intended to abrogate the States' immunity from suit. For the reasons given below, the Court concludes that Congress did intend to do so.

■ The statutory language of § 1362 is inconclusive with respect to Congressional intent.[27] Nonetheless, the inclusive statutory language when combined with the legislative history of § 1362, examined in light of the special status of Indian tribes and their unique relationship with the federal government, supplies sufficient evidence of a clear intent to make the State amenable to suit in Indian land claim actions brought under § 1362.

■ It has long been recognized that the United States, because of its special trust relationship with Indian tribes, can institute suit in federal court on their behalf to protect tribal land rights. *Heckman v. United States*, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1911); *United States v. Boylan*, 265 F. 165 (2d Cir. 1920). The fact that the United States has the power to institute litigation to protect Indian property rights, however, does not preclude the tribes from commencing actions on their own behalf. *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968).

Although the Indian tribes have for some time been allowed to bring suit in federal court, until the enactment of § 1362, they were limited to those for which a jurisdictional basis could be found under the provisions generally available to federal court litigants. Congress recognized that certain actions which could be brought by the United States on the Indian tribes' behalf could not be commenced by the Indians themselves because of the absence of an appropriate jurisdictional authorization. It is

clear that § 1362 was enacted at least in part to correct that situation.

Subsequent to the enactment of § 1362, the Confederated Salish & Kootenai tribes brought an action for injunctive relief with respect to the State of Montana's cigarette sales tax and personal property taxes as they were applied to Indian reservations. The State defendants in *Moe v. Confederated Salish & Kootenai Tribes, Etc.*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) argued unsuccessfully that the suit was barred by the prohibition contained in 28 U.S.C. § 1341 which provides that:

> [t]he district court shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

That particular jurisdictional barrier had previously been found inapplicable to suits brought by the United States. *Department of Employment v. United States*, 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966). Thus, the Supreme Court was faced with the question whether actions commenced by Indian tribes were similarly exempt from § 1341 by virtue of the jurisdictional grant of § 1362.[28] Examining the legislative history of § 1362, the Court found

> an indication of a congressional purpose to open the federal courts to the kind of claims that could have been brought by the United States as trustee, but for whatever reason were not so brought.

*Id.* 425 U.S. at 473, 96 S.Ct. 1641.

The Court then concluded that

> it would appear that Congress contemplated that a tribe's access to federal court to litigate a matter arising "under the Constitution, laws, or treaties" would be at least in some respects as broad as

---

**27.** It is true that the provision does purport to extend to "*all* civil actions" (emphasis added), just as in *Parden* the FELA applied to "every" railroad, and in *Hutto* § 1988 extended to "any" action brought to enforce civil rights. However, as previously discussed, those cases involved special circumstances.

In *Parden* the State was involved in an activity commonly engaged in by private enterprise,

and in any event, the case was decided before the adoption of the clear language requirement in *Employees*. In *Hutto* the Court made a distinction between retroactive damages and litigation costs.

**28.** The Court in *Moe* rejected the plaintiffs' federal instrumentality arguments as a basis for finding § 1341 inapplicable to that case.

that of the United States suing as the tribe's trustee.

*Id.* at 473, 96 S.Ct. 1641.

The question remains whether Congress' intent to provide Indian tribes with substantially the same capacity to commence suit in federal court as the United States constitutes an intent to abrogate the States' Eleventh Amendment immunity from suits brought by tribes under § 1362.[29] The Court in *Confederated Tribes of the Colville Indian Reservation v. Washington*, 446 F.Supp. 1339, 1350 (D.Wash.1976), *aff'd in part and rev'd in part on other grounds*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), *reh. denied* 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1172 (1980), relying on *Moe*, found that the Eleventh Amendment did not bar an action brought by the tribe under § 1362. Special Master Tuttle reached the same conclusion in his Memorandum and Report on Preliminary Issues, 1, 25–29 in *State of Arizona v. State of California* (No. 8 Original, U.S.Sup.Ct., Aug. 28, 1979, unreported). This Court as already mentioned is convinced that in enacting § 1362 Congress intended to remove the States' Eleventh Amendment immunity to suits such as those now before it.

As previously pointed out, one clearly expressed purpose for the passage of § 1362 was to insure that Indian tribes would have access to federal courts with respect to claims which could be brought on the tribes' behalf by the United States, but for which there was no general jurisdictional provision. The House Judiciary Report specifically refers to the $10,000.00 amount in controversy requirement of 28 U.S.C. § 1331 which had in the past prevented tribes from commencing certain actions in federal court.[30] H.R.Rep. No. 2040, 89th Cong. 2d Sess. 2–3 (1966), *reprinted in* U.S.Code Cong. & Adm.News 1966, 3145.

However, as pointed out in the House Judiciary Report, the Legislative Committee felt that there was another relevant justification for enactment of § 1362. By way of explanation, the Report states that:

The enactment of this bill would provide for U. S. district court jurisdiction in those cases where the U. S. Attorney declines to bring an action and the tribe elects to bring the action. As is observed in the Department of the Interior report, the tribes would then have access to the Federal Courts through their own attorneys. *It can therefore be seen that the bill provides the means whereby the tribes are assured of the same judicial determination whether the action is brought in their behalf by the Government or by their own attorneys.* (emphasis added)

H.R.Rep. No. 2040, *supra* at 3147.

█ It is clear that suits brought against States in the federal courts by the United States are not barred by the Eleventh Amendment, *United States v. Mississippi*, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); *United States v. Texas*, 143 U.S. 621, 12 S.Ct. 488, 36 L.Ed. 285 (1892), even when commenced to enforce or protect Indian tribal property rights. *See e. g. State of Montana v. United States, supra.*

█ That being so, the legislative history of § 1362 as interpreted by the Supreme Court in *Moe*, strongly suggests that since the United States could have brought these actions on plaintiffs' behalf, that these Indian tribes should also be allowed to bring them. Moreover, it has long been recognized that Indian tribes occupy a sovereign status somewhat comparable to that of the States. *Puyallup Tribe v. Washington Game Dept.*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977); *Cherokee Nation v. State of Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed.

**29.** The State defendants rely on the decision of the Court in *Standing Rock Sioux Indian Tribe v. Dorgan*, 505 F.2d 1135 (8th Cir. 1974) as support for their Eleventh Amendment argument. Although the Court in that case did find the action barred on Eleventh Amendment grounds it is of limited precedential value since it was decided prior to *Moe* and because, in

addition, it does not contain any analysis supporting the Court's conclusion.

**30.** Congress has, of course, now deleted the amount in controversy requirement from 28 U.S.C. § 1331. Pub.L. 96–486, § 2(a), 94 Stat. 2369.

25 (1831). Because an Indian tribe suing to protect its interest in tribal lands asserts a "sovereign" interest, a somewhat lesser standard than that articulated in *Quern* should be imposed in finding Congressional abrogation of the Eleventh Amendment than when purely private interests are involved. *See Report of Special Master Tuttle, supra.* *See also Nevada v. Hall,* 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), *reh'g denied* 441 U.S. 917, 99 S.Ct. 2018, 60 L.Ed.2d 389 (1979).

For all of the foregoing reasons, the Court holds that Congress in enacting § 1362 intended to abrogate the States' Eleventh Amendment immunity.[31]

*Issue of Consent*

 Having determined that Congress intended to abrogate the States' sovereign immunity, the Court must now consider whether intent alone is sufficient to enable it to assert jurisdiction over the State defendants in these actions for money damages as well as for declaratory and injunctive relief, or whether it is still necessary to find consent or waiver of Eleventh Amendment immunity by the State.

Since it has never been suggested that consent by a State is determinative where the United States sues on behalf of a tribe, and since it has been held above that § 1362 was designed with standing vis-a-vis the States that is roughly comparable to that of the United States, there is seemingly no substantial reason to suppose that a different result should obtain where, as here, the suits are commenced by the tribes themselves.

Furthermore, those Courts and commentators who have addressed the issue, have concluded that consent is no longer required when Congress enacts legislation pursuant to its Commerce Clause powers, so long as there exists a clear Congressional intent to abrogate the States' immunity. *See Peel v. Florida Dept. of Transp., supra; Jennings v. Illinois Office of Education, supra;* Field,

*The Eleventh Amendment and Other Sovereign Immunity Doctrines: Congressional Imposition of Suit Upon the States,* 126 U.Pa.L.Rev. 1203 (1978).

As previously established, consent has been found to be unnecessary for abrogation of immunity when accomplished by Congress through the exercise of its power under § 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer, supra.* It has been suggested that this view might be limited to those instances where Congress acts pursuant to § 5 of the Fourteenth Amendment. The theory underlying this suggestion is that the States in ratifying the Fourteenth Amendment gave the necessary consent to suit and waived their Eleventh Amendment immunity to that extent. *See Peel v. Florida Dept. of Transp., supra.* However, both the Fifth Circuit in *Peel* and the Seventh Circuit in *Jennings v. Illinois Office of Ed., supra* have adopted the broader view that "to the extent Congress acts under the sovereign powers delegated to it by the States 'in the plan of the convention,' it has the power to abrogate the States' immunity." *Jennings, supra,* at 941–42. In those cases Congress had acted pursuant to its war powers. That authority like the authority by which Congress enacted § 1362 is an Article I power.

The Court in *Peel* explained the position adopted by it more completely stating that:

[u]nder this approach, the state waived its immunity from suit in federal court at the same time it surrendered its sovereign immunity and gave Congress the power to legislate under delegated powers. As recognized by Chief Justice Hughes in an early case involving sovereign immunity, States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.' *Monaco v. Mississippi,* 292 U.S. 313, 322–23, 54 S.Ct. 745, 748, 78

---

**31.** *See also Bryan v. Itasca County, Minnesota,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) in which the Court restates the canon of statutory construction requiring that ambiguous statutes passed for the benefit of dependent Indian tribes are to be liberally construed with "doubtful expressions being resolved in favor of the Indians." *Id.* 426 U.S. at 392, 96 S.Ct. 2112.

L.Ed. 1282 (1934). . . . This rationale removes the eleventh amendment as a bar whenever Congress validly has exercised its powers. (*quoting The Federalist*, No. 81) (A. Hamilton).

*Supra* at 1080.

This Court, adopting the reasoning of the Fifth and Seventh Circuits, concludes that so long as there is a clear expression of Congressional intent to abrogate the States' Eleventh Amendment immunity, consent of the State is not required when Congress acts pursuant to its Article I powers, including those under Art. I, § 8, Cl. 3.

 Having already found sufficiently clear Congressional intent under § 1362, the Court finds that these actions are not barred by the Eleventh Amendment.[32] Furthermore, because the Court has found that Congress abrogated the States' sovereign immunity in these cases, it would not be precluded from awarding retroactive money damages in addition to the declaratory and injunctive relief requested should plaintiffs ultimately prevail. *See Fitzpatrick v. Bitzer, supra.*

## DISMISSAL FOR FAILURE TO STATE A CLAIM

 Defendants join in seeking dismissal of each of the plaintiffs' claims for relief in these actions pursuant to Rule 12(b)(6) of the Fed.R.Civ.P. for failure to state a claim upon which relief may be granted. A Rule 12(b)(6) motion has been recognized as the proper vehicle for testing the legal sufficiency as opposed to the factual basis of a complaint. *Lowenschuss v. Kane*, 520 F.2d 255, 262 (2d Cir. 1975). *See also* Wright & Miller, Federal Practice and Procedure: Civil § 1356; 2A Moore's Federal Practice ¶ 12.08. Therefore, dismissal for failure to state a claim is appropriate only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

 In deciding a motion to dismiss made pursuant to Rule 12(b)(6), the Court is required to accept as true all material factual allegations of the complaint and must construe the complaint in favor of the complaining party. *Id.* at 45–46, 78 S.Ct. at 102, 2 L.Ed.2d at 84; *Scheur v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96–97 (1974). However, legal conclusions and unwarranted factual deductions need not be accepted by the Court. *See Challenger v. Local U. No. 1 of Intern. Bridge*, 619 F.2d 645 (7th Cir. 1980); *Hiland Dairy, Inc. v. Kroger Company*, 402 F.2d 968 (8th Cir. 1968), *cert. denied* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969).

32. Although none of the parties has raised the issue of jurisdiction under 28 U.S.C. § 1362 with respect to the individual plaintiffs in 78–CV–104, it is clear that the section does not provide a jurisdictional basis for actions brought by individual Indians. Therefore, this Court's finding that the States are without their Eleventh Amendment immunity in cases brought under § 1362 is of no assistance to the individual plaintiffs.

The plaintiffs have, however, made additional arguments in response to the State defendants' Eleventh Amendment defense, including that the Amendment does not preclude the Court from granting prospective injunctive and declaratory relief, and that it offers no protection to the independent state corporations and authorities named as defendants or defendant class members.

It is unnecessary to address these other contentions with respect to the tribal plaintiffs which can assert jurisdiction under § 1362. It may be, however, that those arguments will at some point have to be addressed with respect to the individual plaintiffs and perhaps even with respect to the tribal plaintiff in that action.

The Court is aware that there have been problems as far as government recognition for the Oneida Nation of New York. It may be that at a later time the Court will be presented with acceptable documentation that there is presently no recognized government, thus making § 1362 unavailable to the plaintiff Oneida Nation of New York.

If that occurs and 78–CV–104 is still extant, the Court will be required to investigate plaintiffs' other claims in order to determine whether the action is barred by the Eleventh Amendment. However for the present, the Court will not undertake any analysis of those Eleventh Amendment issues since regardless of the conclusion reached, the State would be obligated to defend these actions with respect to the tribal entities involved.

The defendants are not presently challenging the factual allegations contained in the plaintiffs' complaints but rather the legal conclusions relied upon by them in their claim for relief. Defendants' motions place in controversy the correct interpretation of, and the legal rights and duties created by the documents relied upon by the plaintiffs, including the Articles of Confederation, the Proclamation of September 22, 1783, the Treaty of Fort Stanwix of 1784, the United States Constitution, the Nonintercourse Act, and the Treaty of Canandaigua of 1794.

In interpreting the relevant portions of the aforementioned documents in order to determine the respective rights and duties created thereby, the Court has found it necessary to examine, in addition to the language of the provisions relied upon by plaintiffs, the history of the relationship between the Indians and the British Crown, the history of Indian legislation in the Colonies and early United States, the legislative and jurisdictional history of the documents and the pertinent case law. As hereinafter detailed, this Court concludes that properly construed, the documents fail to provide a

sufficient legal basis for plaintiffs to sustain the validity of any of their five claims for relief. Accordingly, the plaintiffs' complaints must be dismissed.[33]

## ARTICLES OF CONFEDERATION

Plaintiffs claim that under the Articles of Confederation, the federal government had the sole and exclusive authority to manage relations with the Oneida Indian Nation, including the sole power to extinguish title to their aboriginal land located within the boundaries of New York State. Thus, according to the plaintiffs, the Treaties entered into between New York State and the Oneida Indian Nation in 1785 and 1788 were in violation of the Articles and therefore void.

The defendants contend to the contrary that the Articles preserved the right of the States, including New York, to extinguish Indian title within their geographical boundaries. The Court concludes that the defendants are correct in their assertion that the Treaties of 1785 and 1788 did not violate the Articles of Confederation and may not now be voided on that ground.

**33.** Plaintiffs have expressed concern that because of the introduction of historical evidence by both sides, the defendants' Rule 12(b)(6) motion may be treated by the Court as a summary judgment motion. The plaintiffs caution the Court that the evidentiary record is as yet incomplete, and in their joint memorandum in opposition to the motions to dismiss indicate that they "are prepared to offer extensive expert testimony on most of the issues raised by the motions (e. g., the meaning of article IX of the Articles of Confederation and the Treaty of Canandaigua)." (Pls. memorandum at p. iii) They suggest that "[b]ecause of the enormity of this case and the factual and legal complexity of the issues, they can only be resolved after trial on the merits." *Id.*

The Court concurs with plaintiffs' assessment of the enormity and complexity of these cases. However, it does not agree with plaintiffs' assertion that further factual development is necessary before the Court can render a determination on crucial legal issues raised by the defendants' Rule 12(b)(6) motions.

If the Court had found it necessary to interpret certain provisions of the federal treaties relied upon by both sides, it is not inconceivable that further factual development would have been required. *See Choctaw Nation of*

*Indians v. United States, supra,* 318 U.S. at 431–32, 63 S.Ct. 677–78 (requiring Courts to look beyond the written words of a treaty with the Indians to determine the Indians' understanding of its terms). However, as will be seen, the Court's decision to dismiss is based upon its conclusion as to the allocation of authority under the Articles of Confederation, and the effect of that determination on the legal sufficiency of plaintiffs' claims.

While it is, of course, true that the Court is limited as to what it may properly look at on a motion to dismiss for failure to state a claim, without converting it to a summary judgment motion pursuant to Rule 56 of the Fed.R.Civ.P., it is clearly entitled to look beyond the complaint to matters of public record. *Phillips v. Bureau of Prisons,* 591 F.2d 966 (D.C.Cir.1979); Wright & Miller, *supra* at § 1357. Thus, in construing the documents which form the basis of its decision, this Court may properly rely upon available historical evidence. *Cf. Mohegan Tribe v. State of Connecticut, supra* (Court, in determining intended geographical coverage of the Nonintercourse Act, in addition to considering the statutory language and relevant case law, looked at historical evidence, including the history of Indian legislation and legislative and jurisdictional history).

The Articles of Confederation were entered into by the Continental Congress on November 15, 1777, and ratified on March 1, 1781. Two of the Articles are relevant to the Court's inquiry in these cases. Article II, set forth the limited extent to which the States surrendered their sovereignty to the central government under the Articles:

> Each State retains its sovereignty, freedom and independence, and every power, jurisdiction, and right, which is not by this Confederation, expressly delegated to the United States in Congress assembled.

Articles of Confederation, Art. II, *reprinted* in 1 U.S.Laws 4 (1815).

Article IX dealt in part with the delegation of authority over Indian tribes located within the United States providing at Cl. 4 that:

> The United States in Congress assembled shall also have the sole and exclusive right and power of . . . [r]egulating the trade and managing all affairs with the Indians, not members of any of the States; provided that the legislative right of any State within its own limits be not infringed or violated.[34]

Articles Of Confederation Art. IX, *Id.* at 16–19.

Both plaintiffs and defendants claim support for their respective positions with regard to the allocation of authority over the Indians during the Confederacy period in the language of Article IX, Cl. 4, since pursuant to Article II the States retained all of their sovereign powers not "expressly delegated to the United States," it is incumbent upon the Court to initially determine the extent of the States' sovereign powers with respect to the Indian tribes within their borders prior to ratification of the Articles. Then it must determine the impact of Article IX, if any, on the exercise of

those powers under the Articles of Confederation.

*Historical Background*

■■■ The doctrine of discovery and the concept of extinguishment of aboriginal title arising out of it, were treated by the Court in its discussion on justiciability. The Court concluded that prior to the American Revolution, Great Britain as discovering sovereign had exclusive authority over the extinguishment of the Indians' possessory interests in their aboriginal lands. *See Johnson v. McIntosh, supra.*

However, the Crown initially pursued a policy of delegating that authority through conveyance of land patents and charters to the Colonists, allowing the extinguishment of title either through individual purchase or through the Colonies themselves. *See* Clinton and Hotopp, *Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims*, 31 Me.L.Rev. 17, 20 (1979–80) (hereinafter referred to as "Clinton & Hotopp"). In order to avoid friction with the Indians created by the individual transactions, many of the Colonies, including New York, enacted laws prohibiting individual land transactions without prior Colonial government approval. *See* 1 Colonial Laws of New York from the Year 1664 to the Revolution 149 (1894 ed.). *See also* "State Sovereignty and Indian Land Claims", *supra* at 799; Clinton & Hotopp, *supra* at 20–21.

By the mid-Eighteenth century the Crown recognized that the activities of the Colonial governments were seriously jeopardizing relations with the Indians, particularly the tribes of the Six Nations. *See* Nammock, *Fraud, Politics and the Dispossession of the Indians; The Iroquois Land*

---

34. In their complaints, plaintiffs also alleged that the 1785 and 1788 Treaties violated Cl. 1 of Article IX which provided that "[t]he United States in Congress assembled, shall have the sole and exclusive right and power, of determining on peace and war, . . . [e]ntering into treaties and alliances. . . ."

Plaintiffs appear to have abandoned this claim and chosen to rely solely on Cl. 4. The Court has, in any event, found no support for their Cl. 1 argument. *See* Note "State Sovereignty and Indian Land Claims: The validity of New York's Treaties Prior to the Nonintercourse Act of 1790," 31 Syr.L.Rev. 797, 816–17 (1980) (hereinafter referred to as "State Sovereignty and Indian Land Claims") (Suggesting that "treaty" when used in context of Indian affairs had a different connotation than when referring to foreign nations).

*Frontier in the Colonial Period* (1969). Having determined that centralized control over Indian affairs was necessary to insure peaceful relations with the tribes, the British Crown issued a Proclamation in 1763 which forbade the purchase or settlement of Indian lands by anyone, including the colonial governors without permission of the Crown.[35] *See Mohegan Tribe v. State of Connecticut, supra* at 615; P. Taylor and A. Parker, *Development Tripartite Jurisdiction in Indian Country*, 22 Kans.L.Rev. 351 (1974).

The Crown continued to reserve the exclusive right to extinguish Indian title up until the outbreak of the hostilities with the Colonies. It is plaintiffs' contention that despite the fact that the right of extinguishment was reserved exclusively to the Crown by the Proclamation of 1763, the Colonies retained what plaintiffs refer to as the right of pre-emption, which according to them gave fee title to discovered soil occupied by Indians and the concomitant rights to convey legal title subject to the Indians' occupancy and to purchase the Indians' aboriginal title absent the power to extinguish that title. Although the right of pre-emption has throughout history often

been looked upon as including the right of extinguishment, plaintiffs' argument is based on the correct assertion that they may be two distinct powers not necessarily resting in the same governmental entity at the same time.[36]

However, regardless of the allocation of authority over Indian aboriginal land prior to the American Revolution, it is clear that upon the signing of the Declaration of Independence both of the powers became vested in the States, either because it was already possessed by them as Colonies, or, as later confirmed by the Treaty of Paris ending the Revolutionary War, because all of the powers of government and the right to the soil held by the Crown passed to the States upon their independence.[37] *See Johnson v. McIntosh, supra. See also Massachusetts v. New York*, 271 U.S. 65, 85–86, 46 S.Ct. 357, 359–360, 70 L.Ed. 838 (1926); *Oneida Nation of New York v. United States, supra* 37 Ind.Cl.Comm. at 538 n. 3. Therefore, at the time the Articles of Confederation were ratified, the States including New York, had the sole and exclusive authority to extinguish Indian aboriginal title to lands located within their geographical boundaries. The Court, therefore, may conclude that the

---

**35.** The Proclamation of 1763 is reprinted in 3 W. Washburn, *The American Indian and the United States* 2135–39 (1973) and in H. Commager, *Documents of American History* 47–50 (8th ed. 1968).

**36.** The right of pre-emption does not always include the right to extinguish title. For example, it has been held that by virtue of the Nonintercourse Act, even those States having the right of pre-emption, are without authority to extinguish Indian title to land, or in fact even to exercise their right of pre-emption without federal authorization. *Oneida Indian Nation of New York v. County of Oneida, supra* 414 U.S. at 667, 94 S.Ct. 777. *See also Mohegan Tribe v. State of Connecticut, supra* at 617. (Court stating that the right of pre-emption, or the right to purchase Indian lands was not inconsistent with federal control over the extinguishment of Indian occupancy.)

**37.** Plaintiffs point out that in 1775 the Continental Congress took steps towards creating centralized control over relations with the Indians by establishing a Department of Indian Affairs and appointing a Commissioner to treat with the Indians in the name of the United Colonies for the purpose of preserving peace

and preventing the Indians from siding with the British.

The Commissioner did in fact enter into a treaty with the Delaware Indians in 1778. Articles of Agreement & Confederation, Sept. 17, 1778, United States-Delawares, 7 Stat. 13 (1848). However, the Treaty did not involve land cessions nor did it place any limitations on the State's authority over the Indians, and plaintiffs in their joint memorandum in opposition to the dismissal motions admit that the Commissioners believed themselves to be without authority over Indian land matters.

Nonetheless, plaintiffs appear to claim that the Continental Congress patterning its actions after the British Crown policy, placed management of Indian affairs, including the right of extinguishment, in the Congress prior to the adoption of the Articles of Confederation. The plaintiffs contend that the drafters of the Articles of Confederation also sought to emulate Crown policy in that regard.

While, as will be demonstrated, there were those among the drafters who favored strong central control over Indian affairs, the sentiment was far from unanimous, and there is no clear indication that that group prevailed.

power was ceded to the federal government only if it was expressly granted to the central government in Article IX, Cl. 4 of the Articles.

### Article IX, Cl. 4

Article IX, Cl. 4 of the Articles of Confederation, as previously set forth, expressly granted to the United States the "exclusive right and power of . . . regulating the trade and intercourse with the Indians." However, two limitations were placed on that cession of power to the central government. First, federal authority was limited to those Indians "not members of any of the States. . . ." Second, the federal government was prohibited from infringing upon or violating "the legislative right of any State within its own limits."

The proper construction of Article IX, Cl. 4 regarding the allocation of authority over Indian affairs between the federal government and the States has long been a source of controversy and, as evidenced by these actions, remains so today. As will be seen, perhaps the only point of agreement among the courts and commentators addressing the issue is that the provision is ambiguous and the drafters' intent unclear, and that as a result, Article IX was rendered more or less useless as a means of defining the contours of Federal-State authority over Indian lands.[38]

No consensus as to the correct construction of the two limiting provisos in Article IX, Cl. 4 was ever reached during the Confederacy period, leaving the federal government and the States to act more or less in accordance with their respective interpretations of the powers either granted or left to them by the provision. *See Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 558–59, 8 L.Ed. 483 (1832); Clinton & Hotopp, *supra* at 25. The provision was a major source of conflict between the States and the federal government during the period in which the Articles were in effect, and when the Constitution was enacted the two limiting provisos were omitted. The ambiguities in Arti-

cle IX, Cl. 4 were perhaps best elucidated by James Madison in *The Federalist* No. 42 where he wrote that:

> The regulation of commerce with the Indian tribes is [under the Constitution] very properly unfettered from two limitations in the Articles of Confederation, which render the provision obscure and contradictory. The power is there restrained to Indians, not members of any of the States, and is not to violate or infringe the legislative right of any State within its own limits. What description of Indians are to be deemed members of a State is not yet settled, and has been a question of frequent perplexity and contention in the federal councils. And how the trade with Indians, though not members of a State, yet residing within its legislative jurisdiction can be regulated by an external authority, without so far intruding on the internal rights of legislation, is absolutely incomprehensible. This is not the only case in which the Articles of Confederation have inconsiderately endeavored to accomplish impossibilities; to reconcile a partial sovereignty in the Union, with complete sovereignty in the States; to subvert a mathematical axiom by taking away a part and letting the whole remain.

No Court has previously been required to construe Article IX, Cl. 4 for the purpose of determining the validity of State-Indian land purchase treaties entered into during the Confederacy period. Courts have in the past, however, examined the provision in different contexts, *see e. g. Oneida Nation of New York v. United States, supra,* or discussed it in dicta. *See e. g. Cherokee Nation v. Georgia, supra; Worcester v. Georgia, supra; U. S. v. 43 Gallons of Whiskey,* 93 U.S. 188, 23 L.Ed. 846 (1876); *Mohegan Tribe v. State of Connecticut, supra.* This Court must now determine the extent to which Article IX, Cl. 4 may be construed as an express delegation to the federal government of the States' sovereign power

---

**38.** One commentator has suggested that the "vaguely broad qualifications" on the grant of federal power were deliberately written. Manley, *The Treaty of Fort Stanwix* (1932) at p. 23.

This suggestion, as will be discussed, is not without support in the legislative history of Article IX, Cl. 4.

over Indian aboriginal lands within their boundaries, as that power has previously been described in this decision.

Plaintiffs contend that the two limiting provisos merely refer to the restrictions which were placed on imperial and federal authority during the colonial and constitutional periods. As will be recalled, plaintiffs assert that during the colonial period, while the British Crown held the sole and exclusive authority to manage affairs with the Indians, including the right to extinguish Indian title to land, the Colonies retained the right of pre-emption, defined by plaintiffs as limited to fee title to the soil occupied by the Indians with the concomitant rights to convey legal title subject to the Indians' occupancy rights and to purchase Indian lands. Likewise, the Supreme Court has recognized that under the Constitution, while "the preemptive right to purchase [land] from the Indians, was in the State, ... federal law, treaties, and statutes protected Indian occupancy and ... its termination was exclusively the province of federal law." *Oneida Indian Nation of New York v. County of Oneida, supra* 414 U.S. at 670, 94 S.Ct. at 779. *See also Mohegan Tribe v. State of Connecticut, supra.*

In support of that contention, plaintiffs assert that the phrase "not members of any of the States" was intended to refer solely to individual Indians who had abandoned tribal relations, and that the second limitation, preserving the legislative rights of the States within their own limits was meant to refer only to the right of pre-emption as defined by plaintiffs. Thus, according to plaintiffs' construction all other powers which the States had acquired from the Crown upon declaring their independence, including authority over extinguishment of Indian title, were expressly delegated to the federal government under Article IX.

Defendants offer three possible constructions of Article IX, Cl. 4, all of which preserve the States' right to extinguish aboriginal title to land within their boundaries. One of these focuses upon the limitation imposed by the phrase "not members of any of the States." Under this proposed construction, the proviso is given a territorial connotation and held to leave to the States the right to manage Indian affairs with all of the tribes located within their geographical boundaries rather than only with Indians who had become assimilated into non-Indian society.[39] Thus, the powers of the Federal government under Clause 4 would have been limited to Indians living in the territories ceded to the United States by the States.

A second possible construction suggested by the defendants focuses primarily on the second proviso which they contend was designed primarily to protect the States' pre-emption rights defined to include the right to extinguish Indian title. Construing the second phrase in that manner, even if the plaintiffs' interpretation of "not members of any of the States" is accepted as correct, the States would still have retained the legislative right to extinguish Indian title within their boundaries.

The final construction offered by the defendants comports with James Madison's statement on Article IX in *The Federalist No. 42, supra*—that it constituted an internally inconsistent nullity of no practical value in limiting the sovereign power of the States in the management of Indian affairs.

Examination of the language of Article IX, Cl. 4, its legislative history, contemporaneous interpretation of the provision by those entrusted with its enforcement, and pertinent case law, reveals insufficient support for any of the three proposed constructions based upon asserted definitive interpretations of the two limiting provisos. However, the foregoing provides ample basis for a finding by the Court that because

---

**39.** This interpretation of "not members of any of the States" is, of course, in direct conflict with that offered by plaintiffs. Support can be found for both. The Indian Claims Commission majority in *Oneida Nation of New York v. United States, supra* adopted plaintiffs' proposed construction, while the dissenting member of the Commission favored that offered by the defendants. *See also* the District Court decision in *Mohegan Tribe v. State of Connecticut, supra*, 483 F.Supp. at 602–03. (Construing the phrase in the manner suggested by defendants).

of the unresolved internal inconsistencies in Article IX, Cl. 4 of the Articles of Confederation regarding the management of Indian affairs, the provision may not be construed as an express delegation to the federal government of the sole and exclusive power to extinguish Indian title to land located within the States during the Confederacy period. Therefore, it cannot provide a legal basis for plaintiffs' claim that the Treaties of 1785 and 1788 violated the Articles of Confederation.

*Legislative History*

Both sides have relied to some degree upon the legislative history of Article IX, Cl. 4 for support of their respective positions. Nonetheless, counsel for one group of defendants has accurately pointed out that "[c]andor requires all to admit ... that the legislative history of Article IX does not 'clearly' show anything." (Defendants Counties' and Ryan's reply memorandum in support of the motions to dismiss at pp. 24–25).

As will be seen, if the legislative history shows anything, it is that the final text of Article IX, Cl. 4 was the result of a compromise reached to resolve conflicts between the landed and landless States and more importantly between the States and the federal government by delegating authority over Indian affairs to the federal government while leaving a vaguely defined portion of that authority in the States.

Benjamin Franklin submitted a proposed draft for Articles of Confederation on July 21, 1775. Article XI of the Franklin draft provided in part that:

A perpetual Alliance offensive and defensive, is to be enter'd into as soon as may be with the Six Nations; their Limits to be ascertain'd and secur'd to them; their Land not to be encroach'd on, nor any private or Colony Purchases made of them hereafter to be held good; nor any Contract for Lands to be made but between the Great Council of the Indians at Onondaga and the General Congress. The Boundaries and Lands of all the other Indians shall also be ascertain'd and secur'd to them in the same manner....

2 *Journals of the Continental Congress* 198. Under the Franklin draft the right to extinguish Indian title, even within the boundaries of the States, would have been in the federal government. However, the Continental Congress never acted on the Franklin draft, and the first official draft was presented by John Dickinson of Pennsylvania on July 12, 1776. This draft included two provisions which concerned relations with the Indians. The first, Article XIV, provided that:

A perpetual Alliance, offensive and defensive, is to be entered into by the United States assembled as soon as may be, with the Six Nations, and all other neighbouring Nations of Indians; their Limits to be ascertained, their Lands to be secured to them, and not encroached on; no Purchases of Lands, hereafter to be made of the Indians by Colonies or private Persons before the Limits of the Colonies are ascertained, to be valid: All Purchases of Lands not included within those Limits, where ascertained, to be made by Contracts between the United States assembled, or by Persons for that Purpose authorized by them, and the great Councils of the Indians, for the general Benefit of all the United Colonies.

5 *Journals of the Continental Congress* 549.

The Indian Claims Commission in *Oneida Indian Nation v. United States, supra,* 37 Ind.Cl.Comm. at 538 n. 2, found that Article XIV was intended to deal with a dispute between the landed and the landless States. The Court explained that:

In the early years of the American Revolution, a major dispute existed between the so-called landed states, i. e., those states which claimed that under their colonial charters their territory extended westward to the westernmost limits of the United States, and the landless states, i. e., those states which had a definite western limit under their charters. The landless states adhered to the view that a limited western boundary

should be drawn for the landed states and that the remaining western lands should be owned in common by the United States. The landed states opposed this view. In his draft, Dickinson incorporated the view of the landless states. Thus Article XIV, in effect, prohibited private or state purchase of Indian lands in the landed states until a definite, and limited, western boundary was established for these states.

If the Indian Claims Commission's interpretation of the intent of Article XIV is correct, the provision was not meant to affect the States' sovereign right to extinguish Indian title on any more than a temporary basis. Article XIV was debated by the Continental Congress on July 25 and 26, 1776. Thomas Jefferson proposed an amendment on behalf of the landed States which would invalidate only those purchases "not within the boundaries of any Colony." 6 *Journals of the Continental Congress* 1076. However, there was opposition to this amendment from the landless States and no action was taken on the proposal.

Article XVIII of the Dickinson draft set the bounds of federal authority over Indian affairs, providing that "the United States assembled shall have the sole and exclusive Right and Power of ... Regulating the Trade, and managing all Affairs with the Indians...." 5 *Journals of the Continental Congress* 550. Article XVIII was debated on July 26, 1776. Many of the delegates, particularly those from the landed States, opposed giving the central government the authority to regulate trade and manage the affairs with the Indians.

Although the Indian Claims Commission in *Oneida Nation v. United States, supra,* 37 Ind.Cl.Comm. at 539, suggested that the opposition to Article XVIII arose primarily from the fact that the provision would defeat the States' pre-emptive right by granting the United States the sole authority to manage Indian affairs, including the purchase of land, the legislative history shows that the States were perhaps even more concerned that federalization of Indian affairs would deprive them of profitable trade ventures with the Indians. 6 *Journals of the Continental Congress* 1077–79. This may be because it is not altogether clear that Article XVIII was not intended to deprive the States of any of their powers with respect to Indian lands located within their boundaries. If that had been the intent of Article XVIII, it seems as though the temporary ban on State purchases of Indian land in Article XIV would have been unnecessary.

During debate on the provision Carter Braxton, a representative from Virginia, suggested that Indian tribes which were "tributary to any State" be excluded from the federal control imposed by Article XVIII. *Id.* Thomas Jefferson explained that to mean "Indians who live in the Colony." *Id.* No further action was taken on Articles XIV and XVIII. However, the language in the second draft of the Articles and the debate on that draft demonstrate that the landed States continued to protect their interests concerning the management of Indian affairs.

The second draft of the Articles was submitted to the Continental Congress on August 20, 1776. The provisions contained in Article XIV of the first draft were absent from the second. Article XVIII which became Article XIV in the second draft had been amended by the addition of the phrase "not members of any of the States...." 5 *Journals of the Continental Congress* 682.

This draft was debated on October 27, 1777. Two amendments were proposed, neither of which was adopted. The first would have deleted "not members of any of the States," substituting "not residing within the limits of any of the United States." [40] The second called for the complete redrafting of that portion of Article XIV to provide that the federal government have the sole and exclusive power of

---

**40.** It is interesting to note that the proposed amendment "not residing within the limits of any of the United States" which was rejected, lends itself much more to a territorial connotation than the phrase "not members of any of the States," for which such a construction has been suggested by the defendants.

... managing all affairs relative to war and peace with all Indians not members of any particular State, and regulating the trade with such nations and tribes as are not resident within such limits wherein a particular State claims and actually exercises jurisdiction.

9 *Journals of the Continental Congress* 844.

The proposed redraft would have given the federal government exclusive power in matters of "war and peace" over all Indians who were "not members of any particular State." However, it would have specifically limited federal regulation of trade to Indians located outside of State boundaries. The proposal demonstrates once again the States' concern over the prospect of losing control of trade with the Indians but fails to even address the issue of the States' powers with regard to the aboriginal land within their borders.

However, it appears fairly certain that the States were concerned with protecting their sovereign powers over Indian lands, as evidenced by a third proposed amendment which later became part of Article IX, Cl. 4. The amendment added the phrase "provided, that the legislative right of any State, within its own limits be not infringed or violated" to the August 1776 draft. 9 *Journals of the Continental Congress* 845.

The Indian Claims Commission in *Oneida Nation of New York v. United States, supra*, 37 Ind.Cl.Comm. at 544, concluded that the proviso must have been designed to protect the States' right ·of pre-emption since that was the only legislative right which was asserted by the Crown with respect to the Indians and, therefore, the only right which the States inherited at their independence. While that may be true, the legislative history does not provide an answer to the question of whether the legislative right which was preserved was limited to the right of pre-emption as defined by

the plaintiffs or, as claimed by the defendants, was meant to include the power to extinguish Indian title.

Thus, as previously concluded by the Court, while the legislative history does not offer much support for any of the proposed constructions of the two limiting provisos of Article IX, Cl. 4, it does make it clear that there was a serious conflict between those favoring a strong central government in the management of Indian affairs and those interested in protecting the sovereign power of the States. The lack of consensus over the management of Indian affairs resulted in a compromise by which the drafters "endeavored to accomplish impossibilities; to reconcile a partial sovereignty in the Union, with complete sovereignty in the States; to subvert a mathematical axiom by taking away a part and letting the whole remain." *The Federalist No. 42, supra.*

*Contemporaneous Interpretations of Article IX, Cl. 4*

Many of the actions of the Continental Congress and those authorized by it to represent the federal government under the Articles of Confederation demonstrated a clear lack of certainty over the extent of the central government's authority over purchases of Indian land by the States within whose boundaries it was located. This showing of uncertainty supports the Court's conclusion that Article IX, Cl. 4, because of its internal ambiguities, did not constitute an effective delegation of the States' sovereign power with regard to the extinguishment of Indian title to land.[41]

The limited geographical application of the Proclamation of September 22, 1783, provides one example. As a part of their first claim for relief in these actions, plaintiffs allege that the Treaties of 1785 and 1788 were entered into by New York State in violation of the Proclamation. However,

---

**41.** As recognized by the Second Circuit in *Mohegan Tribe v. State of Connecticut, supra* at 623 " '[l]ongstanding, contemporaneous executive and administrative interpretation by those entrusted with the enforcement of ambiguous legislation may also shed light upon an appropriate construction' of statutory language." (quoting from *Leary v. United States*, 395 U.S.

6, 25, 89 S.Ct. 1532, 1542, 23 L.Ed.2d 57 (1969).)

This Court sees no reason why the contemporaneous interpretation of Article IX, Cl. 4, as evidenced by the actions and words of those representing the federal government should not be relied upon in these cases.

rather than viewing it as a possible basis for plaintiffs' recovery in these lawsuits, the Court sees the Proclamation as an indication either that the Continental Congress did not believe that it had any authority to regulate land cessions within the boundaries of the States or that it was at least unsure enough of its power that it did not attempt to do so.

The Proclamation of 1783 provides that: Whereas by the ninth of the Articles of Confederation, it is among other things declared, that "the United States in Congress assembled have the sole and exclusive right and power of regulating the trade, and managing all affairs with the Indians, not members of any of the states, provided that the Legislative right of any State, within its own limits, be not infringed or violated." And whereas it is essential to the welfare and interest of the United States as well as necessary for the maintenance of harmony and friendship with the Indians, not members of any of the States, that all cause of quarrel or complaint between them and the United States, or any of them, should be removed and prevented: Therefore the United States in Congress assembled have thought proper to issue their proclamation, and they do hereby prohibit and forbid all persons from making settlements on lands inhabited or claimed by Indians, without the limits or jurisdiction of any particular State, and from purchasing or receiving any gift or cession of such lands or claims without the express authority and directions of the United States in Congress assembled.

And it is moreover declared, that every such purchase or settlement, gift or cession, not having the authority aforesaid, is null and void, and that no right or title will accrue in consequence of any such purchase, gift, cession or settlement. . . .

25 *Journals of the Continental Congress* 602.

The first sentence of the Proclamation indicates that it was issued pursuant to the Continental Congress' Article IX powers. Then, by its own terms, the Proclamation restricted the prohibition on purchases of Indian lands only to those "without the limits or jurisdiction of any particular State." [42] The limited coverage of the Proclamation suggests that the Congress at least questioned that its authority extended any further.

Plaintiffs also rely upon documentation of dealings between the Continental Congress and the Legislature of the State of Pennsylvania with respect to the purchase of Indian lands by that State as support for their argument that under the Articles the Federal government had sole authority to extinguish Indian title to land located within the boundaries of the States. However, again the Court finds that rather than bolstering plaintiffs' claim, the dealings outlined by them support the Court's conclusion with respect to Article IX, Cl. 4.

Prior to the signing of the Treaty of Fort Stanwix of 1784, the Pennsylvania State Legislature instructed its delegates to the Continental Congress to consult with that body regarding purchases of Indian land located within the State. The instructions noted that:

The custom of Pennsylvania has always been to purchase the right of possession from the Indian natives, as being more consonant to justice, and less expensive than force. This, however, cannot be done without some convention or conference with the Indians for that purpose.

Although this business may be said strictly to regard only the internal policy of Pennsylvania, and the conference proposed does not extend to any description of men without the limits of the United States, nor regard any of the great ob-

---

**42.** Plaintiffs contend that the phrase "without the limits or jurisdiction of any particular State" merely constituted a shorthand version of the two limiting provisos in Clause 4 as they interpret them, rather than a strict geographical limitation on the reach of the Proclamation. Thus, according to them, the Proclamation pro-

hibited land purchases within the States as well as without.

The plaintiffs fail to offer any support for this construction of the Proclamation. *But see contra, Mohegan Tribe v. State of Connecticut, supra*; Clinton & Hotopp, *supra* at 26.

jects of peace and war; *yet our high respect for the Confederation determines us to lay open the whole design of the State to Congress.* (emphasis added)

25 *Journals of the Continental Congress* 595.

Plaintiffs contend that Pennsylvania believed that it was required to obtain United States' consent before· purchasing Indian lands. However, the instruction reveals, that to the contrary, the Legislature did not believe that permission was required and was merely acting out of respect for the central government.

Congress responded with the following resolution:

> Whereas it appears that the application of the legislature of Pennsylvania, relative to a treaty for the purchase of the Indian claim to lands within the jurisdiction of that State, proceeded from a respectful attachment to the federal government, and of desire to guard against prejudices which might arise from the interference of their own particular views with the authority of the United States: That the public interest might have been deeply affected by a negotiation for such purchase independent of, and unconnected with the general treaty to be holden on behalf of the United States:
>
> Resolved, That the commissioners for holding the convention with the Indians under the act of the fifteenth day of October instant give notice to the supreme executive of the State of Pennsylvania, of the time and place of holding such treaty, to the end, that the persons to be appointed by that State, for purchasing lands within the limits thereof, at

the expense of the said State, may attend for the sole purpose of making such purchase, at the time and place appointed for holding the said treaty: and the commissioners on the part of the United States, are instructed to give every assistance in their power, to the commissioners who may be appointed on the part of Pennsylvania, towards promoting the interest of that State, as far as the same may consist with the general. interest of the Union.

25 *Journals of the Continental Congress* 766–67.

Again, there is no suggestion that the State was required to gain Congressional approval of land purchases from the Indians, but rather a recognition that the State was acting out of respect for the central government. The federal commissioners were instructed to assist the State, not to direct its actions in any particular manner.

˙ In fact, the only restriction which was even suggested by the Continental Congress was that "no engagements relative to peace or war with the said Indians, be entered into by the said State." 25 *Journals of the Continental Congress* 591–95. Even this proposal was voted down, *Id.*, and the federal government took no part in the ensuing negotiations between the State of Pennsylvania and the Six Nations. *See The Six Nations v. United States*, 173 Ct.Cl. 899, 903 (Ct.Cl.1965). *See generally* Kent, *Iroquois Indians I, History of Pennsylvania Purchases from Indians* (1974); thus, the actions of the Continental Congress in that instance demonstrated either a belief that federal authority did not extend to Indian land transactions within the States or at the very least uncertainty as to the extent of that power.[43]

---

**43.** The Six Nations brought suit under the Indian Claims Commission Act, 25 U.S.C. § 70a, alleging that the United States breached its fiduciary duty to the Indians by its failure to protect them in the land purchase transactions with Pennsylvania. The fiduciary duty was claimed to have arisen from the guarantees contained in the Treaty of Fort Stanwix.

However, the Court in *Six Nations v. United States, supra.*, found that the Treaty, primarily a peace treaty, did not create a duty on the part of the federal government to preserve Indian interests against third parties. The Court's

conclusion was based, at least in part, upon its belief that Article IX of the Articles of Confederation may have deprived Congress of the power to oversee the Six Nations' dealings with Pennsylvania.

In describing the situation at the time of the land purchases between Pennsylvania and the Six Nations, the Court stated that:

> [t]here is much in the history of the times demonstrating that the states were jealous of their right to negotiate with their own Indians. Pennsylvania was deferential but firm in this insistence . . . .

History shows that New York State was far less cooperative with the federal government in its dealings with the Indian tribes whose aboriginal lands were located within its boundaries. New York was preparing to treat with the Indians at the same time that the United States was preparing to negotiate the Treaty of Fort Stanwix of 1784 with the Six Nations.

The federal government was aware of the State's plans, and two of the federal commissioners wrote to Governor Clinton on August 19, 1784, stating that:

"As the particular Nature of the Business your Excellency is to transact with the Six Nations on the Part of this State, is not known to Us, We can not form a proper Judgment how far it is compatible with the commission we have the honor to bear from the United States in Congress assembled. But We submit to your Excellency's Determination, whether that Business will not be more properly transacted at the same time with and in Subordination to the General Treaty.

"Such Conduct on the Part of the State of Pennsylvania has been generally approved for its Wisdom and Confederal Policy. It is with a View that this State may have an Opportunity of shewing the same Respect for the Confederation and may avail itself of the same Advantages that We have the honor of communicating to your Excellency our Determination to meet the Indians of the Six Nations at Fort Stanwix on the 20th of September next."

Hough Report, 1861, to the New York State Legislature on Indian Affairs 28–30. *See also* Manley, *supra.*

More recently, in *Oneida Nation of New York v. United States, supra.*, 37 Ind.Cl.Comm. at 548 n. 9, the Indian Claims Commission reevaluated its prior decision regarding the power of the federal government and concluded that the United States did have authority to intervene in negotiations between Pennsylvania and the Indians with regard to the land purchases and thus had the same authority with respect to New York. However, the level of intervention purportedly allowed was not clearly spelled out by the Court and may have been limited to intervention in a solely advisory capacity, since

It should be noted that the State's cooperation was not demanded but merely requested. Nonetheless, cooperation was not forthcoming. In fact, during the Fort Stanwix Treaty negotiations, the State observers who attended were so disruptive that they were finally barred from the proceedings. *See* Manley, *supra* at 82–85. New York went on to enter into many treaties with various members of the Six Nations under what has been described by Chief Justice Marshall as "a then unsettled construction of the confederation." *Cherokee Nation v. Georgia, supra* 30 U.S. at 17.

Perhaps the strongest assertion of federal power under Article IX, Cl. 4 is found in a report of the Committee on Southern Indian Affairs appointed by the Continental Congress. The report, prepared in response to the situation which existed in Georgia and North Carolina with respect to encroachment on Indian lands, stated that:

. . . there is another circumstance far more embarrassing, and that is the clause in the confederation relative to managing all affairs with the Indians, &c. is differently construed by Congress and the two States within whose limits the said tribes and disputed lands are. The construction contended for by those States, if right, appears to the committee, to leave the federal powers, in this case, a mere nullity; and to make it totally uncertain on what principle Congress is to interfere between them and the said tribes; The States not only contend for this construction, but have actually pursued measures in conformity to it. North Carolina has undertaken to assign land to the Cherokees, and Georgia has proceeded to treat with the Creeks concerning peace, lands,

in the same decision the Court concluded that the federal government probably could not have used legal actions, military intervention or criminal sanctions to prevent the sales. *Id.* at 550.

On appeal the Court of Claims declined to reach any conclusion as to the exact scope of Federal authority under Article IX, assuming *arguendo* "that the State had the full right of preemption, i. e. that it had the sole right to buy the [Indians'] lands, and that the central Government could not unilaterally prevent it from doing so." *Supra,* 576 F.2d at 878.

and the objects, usually the principal ones in almost every treaty with the Indians. This construction appears to the committee not only to be productive of confusion, disputes and embarrassments in managing affairs with the Independent tribes within the limits of the States, but by no means the true one. The clause referred to is, "Congress shall have the sole and exclusive right and power of regulating the trade and managing all affairs with the Indians, not members of any of the States; provided that the Legislative right of any State within its own limits be not infringed or violated". In forming this clause the parties to the federal compact, must have had some definite objects in view; the objects that come into view principally, in forming treaties or managing Affairs with the Indians, had been long understood and pretty well ascertained in this country. The committee conceive that it has been long the opinion of the country, supported by Justice and humanity, that the Indians have just claims to all lands occupied by and not fairly purchased from them; and that in managing affairs with them, the principal objects have been those of making war and peace, purchasing certain tracts of their lands, fixing the boundaries between them and our people, and preventing the latter settling on lands left in possession of the former. The powers necessary to these objects appear to the committee to be indivisible, and that the parties to the confederation must have intended to give them entire to the Union, or to have given them entire to the State; these powers before the revolution were possessed by the King, and exercised by him nor did they interfere with the legislative right of the colony within its limits; this distinction which was then and may be now taken, may perhaps serve to explain the proviso, part of the recited clause. The laws of the State can have no effect upon a tribe of Indians or their lands within the limits of the state so long as that tribe is inde-

pendent, and not a member of the state, yet the laws of the state may be executed upon debtors, criminals, and other proper objects of those laws in all parts of it, and therefore the union may make stipulations with any such tribe, secure it in the enjoyment of all or part of its lands, without infringing upon the legislative right in question. It cannot be supposed, the state has the powers mentioned without making the recited clause useless, and without absurdity in theory as well as in practice. . . .

33 *Journals of the Continental Congress* 457–59.

The committee's conclusion that the Federal government had sole and exclusive control over the purchase of Indian lands located within the States is based upon its stated belief that the drafters of Article IX, Cl. 4 must have intended that authority over Indian affairs be indivisible, going either wholly to the federal government or wholly to the States. While for all of the reasons articulated by the committee authority over all Indian affairs, including land purchases, should probably have been in either the federal government or with the States, that was not the case.

The legislative history previously reviewed by the Court demonstrates that the authority was not made indivisible but to the contrary, was as a matter of compromise allocated between the United States and the States. The committee admitted in the report that if powers over the Indians were construed to be divided, it would "make it totally uncertain on what principle Congress [was] to interfere between [the States] and the said tribes" and would "[make Article IX, Cl. 4] useless, and [absurd] in theory as well as in practice." *Id.*

That, of course, is substantially the same conclusion reached by this Court with regard to the provision. In any event, the Continental Congress, perhaps due to uncertainty as to the limits of its authority voted to postpone any action on the problem indefinitely. *Id.* at 463.[45]

---

**45.** The decision not to act may also have been based upon the fact that the federal government was probably without legal power to pre-

vent Georgia and North Carolina from doing as they wished. *See Oneida Nation of New York v. United States, supra,* 576 F.2d at 881.

A final indication that confederation contemporaries questioned the effective limits of federal authority over Indian land purchases by the States under the Articles is found in the text of a speech delivered by George Washington to the Seneca Indian Nation, after the adoption of the Constitution, in response to Seneca complaints over loss of their lands, in which he stated that:

> I must inform you that these evils arose before the present Government of the United States was established, when the separate states and individuals under their authority, undertook to treat with the Indian tribes respecting the sale of their lands. But the case is now entirely altered: the General Government only has the power to treat with the Indian nations, and any treaty formed, and held without its authority, will not be binding.

4 American State Papers 142 (1 Indian Affairs 1832).

*Case Law*

As previously pointed out, no Court has yet had to construe Article IX, Cl. 4 for the purpose of determining the validity of treaties entered into between the States and Indian tribes for the purchase of land located within the geographical boundaries of those States during the Confederacy period. However, the Supreme Court has on occasion referred to the provision in dicta and has consistently recognized that regardless of what may have been the intent of the drafters, the ambiguous language of Article IX, Cl. 4 placed serious restrictions on federal power to regulate Indian affairs during the Confederation period.

For example, Chief Justice Marshall in *Worcester v. Georgia, supra* 31 U.S. at 558–59 wrote the following in reference to Article IX, Cl. 4:

> [the Articles of Confederation] also gave the United States in congress assembled the sole and exclusive right of "regulating the trade and managing all the affairs with Indians, not members of any of the states; provided that the legislative power of any state within its own limits be not infringed or violated."

The ambiguous phrases which follow the grant of power to the United States, were so construed by the states of North Carolina and Georgia as to annul the power itself. The discontents and confusion resulting from these conflicting claims, produced representations to congress, which were referred to a committee, who made their report in 1787. The report does not assent to the construction of the two states, but recommends an accommodation, by liberal cessions of territory, or by an admission, on their part, of the powers claimed by congress. The correct exposition of this article is rendered unnecessary by the adoption of our existing constitution. That instrument confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several states, and with the Indian tribes. These powers comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restrictions on their free actions; *the shackles imposed on this power, in the confederation, are discarded.* (emphasis added)

Some time later, in *U. S. v. 43 Gallons of Whiskey, supra* 93 U.S. at 194 the Supreme Court recognized that while

> [u]nder the articles of confederation, the United States had the power of regulating the trade and managing all affairs with the Indians not members of any of the States; provided that the legislative right of a State within its own limits be not infringed or violated, *[o]f necessity, these limitations rendered the power of no practical value.* (emphasis added)

More recently, the Second Circuit in *Mohegan Tribe v. State of Connecticut, supra* at 615, observed that:

> [t]he limitations on federal authority to deal with Indian affairs contained in Article IX of the Articles of Confederation created uncertainty over the relative sphere of federal and state authority and were removed in the Constitution.

While none of these decisions is controlling on the issue, the quoted dicta regarding Article IX, Cl. 4 clearly lends support to this

Court's conclusion that the provision, because of the internal ambiguities which were not resolved during the Confederacy period, may not now be construed as an express delegation to the federal government of the States' sovereign power to extinguish Indian title to land within its borders.

## PROCLAMATION OF SEPTEMBER 22, 1783

The plaintiffs allege that the 1785 and 1788 Treaties entered into between New York State and the Oneida Indian Nation are null and void for violation of the Proclamation of 1783. This argument must fail for at least two reasons.

 First, this Court has already declined to accept plaintiffs construction of the Proclamation by which it would have prohibited land purchase transactions between the States and the Indian tribes, with respect to Indian lands located within the geographical boundaries of the States. The language of the Proclamation which provides that only purchases of land "without the limits or jurisdiction of any particular State" were prohibited, clearly suggests a geographical connotation and has been so construed by this Court. *See also Mohegan Tribe v. State of Connecticut, supra.*

 Second, even if the Court accepted plaintiffs' construction, the Proclamation could not provide a legal basis for their recovery in these actions. The Proclamation was issued by the Continental Congress pursuant to its authority under Article IX, Cl. 4 of the Articles of Confederation. Since the Court has determined that the provision did not constitute an effective delegation of the States' sovereign power to extinguish Indian title within its boundaries to the federal government, it must also conclude that the Continental Congress was without authority to prohibit the States from purchasing Indian land. Any attempt to do so would have been *ultra vires* and thus without effect.

## TREATY OF FORT STANWIX

 Plaintiffs also claim that the Treaties of 1785 and 1788 are void for violation of the federal guarantees allegedly contained in the Treaty of Fort Stanwix entered into between the United States and the Six Nations in 1784.

Prior to the commencement of negotiations for the Treaty, the Federal Committee on Indian Affairs reported out proposed instructions for the treaty commissioners which provided in part that:

... whereas the Oneida and Tuscarora Tribes have adhered to the cause of America, and joined her arms in the course of the late war, and Congress have frequently assured them of peculiar marks of favour and friendship, the said commissioners are therefore instructed to reassure the said tribes of the friendship of the United States and that they may rely that the lands they claim as their inheritance will be reserved for their sole use and benefit until they think it for their own advantage to dispose of the same.

25 *Journals of the Continental Congress* 687.

Article II of the Treaty thus provides that "[t]he Oneida and Tuscarora nations shall be secured in the possession of the lands on which they are settled." Plaintiffs contend that this provision gave them a Federal right to possession of their aboriginal lands which could be extinguished only by the Continental Congress. Thus, according to the plaintiffs, the Treaty gives them a cause of action to vindicate this alleged right to possession.

However, even if plaintiffs are correct in their assertion that Article II of the Treaty was intended as a guarantee by the federal government that the Oneidas would be protected in the possession of their lands, the Treaty cannot provide them with a legal basis for relief for loss of those lands to New York State as a result of the Treaties of 1785 and 1788. The Court has already determined that under the Articles of Confederation, the federal government was without authority to prevent the purchase by the States of Indian lands located within their boundaries. Just as the federal government was without power to issue a Proclamation prohibiting purchase of Indi-

an lands by the States in which the lands were located, it could not expand its powers through a Treaty. *Cf. Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

## ARTICLE I, §§ 8 & 10 OF THE UNITED STATES CONSTITUTION

 Plaintiffs in 78–CV–104 claim that at the time New York State entered into the 1788 Treaty with the Oneida Nation, the United States had the sole and exclusive authority to enter into treaties and regulate affairs with the Indians by virtue of Article I, § 8, Cl. 3 which grants Congress the power to "regulate commerce with the Indian tribes" and § 10, Cl. 1 which precludes States from "entering into any treaty."

Crucial to the plaintiffs' argument is their assertion that the Constitution was in effect on September 22, 1788, the date on which the Treaty was concluded. The plaintiffs contend that the Constitution became effective after ratification by the ninth State on June 21, 1788, with New York ratifying in July of 1788.

However, the Supreme Court long ago concluded otherwise in a case in which the issue was whether the provisions of the Constitution applied to acts of state legislatures in 1788. Writing for the Court in *Owings v. Speed,* 18 U.S. (5 Wheat.) 420, 422, 5 L.Ed. 124 (1820), Chief Justice Marshall concluded that:

> [t]he new government did not commence, until the old government expired. *It is apparent, that the government did not commence on the constitution being ratified by the ninth state* ; for these ratifications were to be reported to congress, whose continuing existence was recognized by the convention, and who were requested to continue to exercise their powers, for the purpose of bringing the new government into operation. In fact, congress did continue to act as a government, until it dissolved on the first of

November, by the successive disappearance of its members. It existed potentially, until the 2d of March, the day preceding that on which the members of the new congress were directed to assemble. (emphasis added)

The Court in *Owings* ruled that the Constitution did not become operative until the first Wednesday in March of 1789, the date set by resolution of the old government. Therefore, plaintiffs' claims under the Constitution must fail.[45]

## CONSTRUCTIVE TRUST AND FRAUDULENT MISREPRESENTATION CLAIMS

*Constructive Trust*

Plaintiffs assert that the misconduct of the State's officials, along with the unequal bargaining power of the parties and the allegedly unconscionable consideration paid under both the 1785 and 1788 Treaties with New York State gave rise to a constructive trust, with the Oneida Nation as holder of beneficial title to the lands conveyed under the Treaties. According to the plaintiffs, the Oneida Nation held that beneficial interest at the time of the passage of the Nonintercourse Act in 1790, thus bringing it within the protection of the Act.

 The plaintiffs' constructive trust argument must fail for at least two reasons. First, this Court concludes that the justness of the extinguishment of Oneida title by New York in the two Treaties is not open to review in the federal courts. The issue of judicial review of extinguishment of Indian title was touched upon by the Court in its discussion on justiciability. However, decision on the question of the extent of this Court's authority to review the manner of State extinguishment of Indian title during the Confederacy period was deferred to this point.

As will be recalled from the Court's previous discussion, federal courts may not in-

---

**45.** It is not at all clear that plaintiffs' constitutional claims could provide a legal basis for recovery in any event. At least one commentator has suggested that the constitutional provisions alone were ineffective to terminate the States' pre-emptive rights, including the right

to extinguish Indian title. Rather, "an explicit preemption by legislation was required." *State Sovereignty and Indian Land Claims, supra* at 837. The Nonintercourse Act which was not enacted until 1790 is said to have constituted the requisite "explicit preemption." *Id.*

quire into the "manner, method and time" of Congressional extinguishment of Indian title to land. *United States v. Santa Fe Pacific Ry. Co., supra* 314 U.S. at 347, 62 S.Ct. 252. Defendants, relying on the decision in that case, claim that assuming New York had authority to extinguish Indian title to land within its boundaries during the Confederacy period, this Court may no more review the methods used by the State in the 1785 and 1788 Treaties than it could had the treaties been entered into by Congress under the Constitution.

The statement of the Supreme Court in the *Santa Fe* case with regard to justiciability appears to this Court to have been based primarily upon the discovery doctrine and the authority of the sovereign to extinguish Indian title granted in accordance with that doctrine.[46] Construed in that manner, the Court's conclusion on justiciability would be applicable whether the extinguishment was effected by Congress under the Constitution or by the States during the Confederacy period when, as this Court has already found, the States held the sovereign power to extinguish Indian title to land within their borders. *See Johnson v. McIntosh, supra.* Restriction of the language in *Santa Fe* to extinguishment by Congress rather than the States, is attributable to the fact that the case involved actions which took place subsequent to the adoption of the Constitution when Congress had the sole power to extinguish Indian title by virtue of the Nonintercourse Act. Therefore, the restriction does not in the opinion of this Court preclude its applicability to the States under the Articles of Confederation.

Thus, whether New York State in 1785 and 1788 extinguished the Oneida Nation's title to their aboriginal land "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts." *Santa Fe, supra* 314 U.S. at 347, 62 S.Ct. 252.

■ The second reason why plaintiffs' constructive trust argument must fail is that, even assuming *arguendo* that this Court is empowered to examine the justness of the Treaties of 1785 and 1788, the plaintiffs' allegations fail to state a claim for relief under the Nonintercourse Act.

As previously set forth, the Nonintercourse Act, 25 U.S.C. § 177, which was initially enacted in 1790, provides in part that:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

Plaintiffs do not claim that the statute applies retroactively to the 1785 and 1788 conveyances. They contend instead that the beneficial title to the lands which they allegedly hold as the result of a constructive trust which assertedly arose out of those transactions, came under the protection of the Nonintercourse Act upon its enactment.[47] Plaintiffs then conclude that since

**46.** Justice Douglas' characterization of the issue of the "manner, method and time" of extinguishment of Indian title by Congress as "political, not justiciable" creates some uncertainty as to whether the Court's conclusion in the *Santa Fe* case was based upon the political question doctrine or reached because "the duty asserted [could not be] judicially identified [or] its breach judicially determined...." *Baker v. Carr, supra* 369 U.S. at 198, 82 S.Ct. 700. If based exclusively on the political question doctrine, its applicability to the State actions being challenged in these lawsuits would be questionable, since that doctrine has been held inapplicable to the federal courts' relationship with the States. *See Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

It is unclear, however, whether the political question doctrine could provide the basis for a finding of nonjusticiability in a case involving pre-constitutional state action. This Court need not decide the question, since it has determined that the Supreme Court's conclusion in *Santa Fe* was based not so much on the political question doctrine as on the fact that the doctrine of discovery and the sovereign's authority thereunder precluded the existence of a judicially identifiable duty or a judicially determinable breach.

**47.** In their complaints, plaintiffs appear to allege that a constructive trust arose automatically as a result of the state officials' misconduct. However, under New York law, a con-

the federal government has not since consented to the sale or extinguishment of that beneficial interest, that the Oneidas still hold equitable title to the lands.

However, in order to state a claim for violation of the Nonintercourse Act, a post 1790 conveyance must be alleged. Since the only conveyances alleged in plaintiffs' complaints with respect to their constructive trust argument, took place in 1785 and 1788, no claim has been stated upon which relief might be granted under the provisions of the Act.

*Fraudulent Misrepresentations*

■ For their third claim, plaintiffs in both actions assert that the defendant State of New York is liable to them for fraudulent misrepresentation. According to the plaintiffs, the State intentionally mislead the Oneida Nation about the purpose and intent of the 1785 and 1788 Treaties, representing their purpose as being to protect and preserve the Oneida's land rather than to purchase it outright from them. The plaintiffs allege that the Oneidas agreed to the transactions in reliance upon the State's representations and as a result lost the use and possession of their lands.

In accordance with the Court's prior determination that it may not inquire as to the justness of the State's actions in extinguishing Oneida title to their aboriginal lands in the 1785 and 1788 Treaties, it concludes that plaintiffs' fraudulent misrepresentation claim presents solely nonjusticiable issues and must therefore be dismissed.

PERPETUAL LEASE OR TRUST CLAIM

Plaintiffs allege that the Treaty of 1788 constituted either a perpetual lease or an express or implied trust rather than an outright sale of the subject lands.[48] The State is asserted to have breached the terms of the lease or trust by deceptively and fraudulently inducing the Oneidas to enter into the 1788 Treaty, by failing to make promised increases in the annual payment for use of the lands and by purporting to unilaterally extinguish its rental obligation through capitalization of future payments into one lump sum payment in 1839.

The plaintiffs contend that upon the enactment of the Nonintercourse Act in 1790, the Oneida's reversionary or beneficial interest in the land came under the protection of that statute. According to plaintiffs, the United States has not since that time consented to the State's failure to make periodic rental increases or the State's attempt to extinguish the Oneida's reversionary or

---

structure trust is an equitable remedy which may only be imposed by the Court

through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

*Simonds v. Simonds*, 45 N.Y.2d 233, 241, 408 N.Y.S.2d 359, 363, 380 N.E.2d 189, 193 (1978). Thus, a constructive trust is not actually a trust at all, and unless a Court chooses to impose one, a constructive trust may not be found to exist under New York law.

48. In their fourth claim for relief plaintiffs include an assertion that the State of New York breached an express trust obligation to protect Indian lands, which it had by virtue of Art. 37 of the New York State Constitution. Art. 37 provides that:

. . . *And whereas*, it is of great importance to the safety of this state that peace and amity with the Indians within the same, be at all times supported and maintained: AND WHEREAS, the frauds, too often practised towards the said Indians, in contracts made for their lands, have, in divers instances, been productive of dangerous discontents and animosities: BE IT ORDAINED, that no purchases or contracts for the sale of lands made since the 14th day of October, in the year of our Lord one thousand seven hundred and seventy-five, or which may hereafter be made with or of the said Indians, within the limits of this state, shall be binding on the said Indians, or deemed valid, unless made under the authority and with the consent of the legislature of this state.

N.Y.Const. of 1777, art. XXXVII.

Plaintiffs have apparently abandoned their Art. 37 claim, having failed to offer any argument against its dismissal on these motions. It is clear to the Court that plaintiffs' attempt to state a claim for relief under Article 37 would have failed in any event. The provision was enacted to protect New York Indians from private speculators who sought to control their lands, *see Goodell v. Jackson*, 20 Johns. 693 (N.Y.Ct. of Errors 1823), and had no application to State land purchases.

beneficial interest. Thus, plaintiffs' claim that the State of New York remains obligated to them for past and future rental payments, including periodic increases under the terms of the lease or trust agreement. However, as explained below, the Court concludes that plaintiffs' argument that the 1788 Treaty constituted a lease or trust fails to state a claim upon which relief may be granted in the federal courts.[49]

The Second Circuit, quoting from the Restatement (Second) of Trusts § 2 (1959), has recently defined a trust as "a fiduciary relationship with respect to property, subjecting the person by whom the title to property is held to equitable duties to deal with the property for the benefit of another person, *which arises as a result of a manifestation of an intention to create it."* *Coleman v. Golkin, Bomback & Co., Inc.,* 562 F.2d 166, 168–69 (2d Cir. 1977) (emphasis added). The formation of a trust is dependent upon the intent of the parties, which, if not clearly expressed in the language of the agreement, may be inferred from all of the surrounding circumstances. *Stratford Financial Corporation v. Finex Corp.,* 367 F.2d 569, 571 (2d Cir. 1966); *In re Chicago Express, Incorporated,* 222 F.Supp. 566 (S.D.N.Y.1963), *aff'd* 332 F.2d 276 (2d Cir.), *cert. denied* 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964).

While plaintiffs assert that the 1788 Treaty constituted a trust rather than a sale of the subject land, they fail to make sufficient factual allegations to support that conclusion. There is no language in the Treaty which may be interpreted as creating an express trust, and nothing in the surrounding circumstances, as alleged by plaintiffs, from which this Court could reasonably infer that the parties intended to enter into a trust agreement.

The historical evidence offered by plaintiffs suggest, if anything, that the Oneidas themselves did not construe the Treaty as a trust agreement. As pointed out by the plaintiffs, the Oneida leaders, in a 1790 letter to Governor Clinton with regard to the 1788 Treaty, stated that "[w]e returned home possessed with an Idea that we had *leased* our Country to the People of the State. . . ." Hough Report, *supra* at 360. (emphasis added). Thus, it appears that if the Oneidas intended the Treaty to be anything other than an outright sale of their lands, they meant for it to be a lease.

Plaintiffs appear to rest their trust allegation solely upon a statement of the Indian Claims Commission in *Oneida Nation of New York v. United States, supra,* 37 Ind. Cl.Comm. at 530, that "the Commissioners allowed the Oneidas to believe that New York was assuming a trust relationship with regard to their land, although this was clearly not the state's intention." However, the Indian Claims Commission did not find that the Treaty of 1788 constituted a trust agreement. To the contrary, the Commission concluded that the State had no intention of creating a trust. Because the plaintiffs have failed to allege facts upon which this Court could conclude that either of the parties to the 1788 Treaty intended the creation of a trust, the claim may not be sustained.

Plaintiffs' lease argument is based upon both the language of the Treaty and the intent of the parties as demonstrated by the treaty negotiations. Article I of the 1788 Treaty of Fort Schuyler provides that "[t]he Oneidas do cede and grant all their lands to the people of the State of New York forever." The plaintiffs contend that the words "cede and grant" may be used to create a lease and that use of the term "forever" is consistent with either a perpetual lease or an outright sale. Plaintiffs correctly point out that leases granted "forever", or perpetual leases were not uncommon in the early history of New York State.

---

**49.** Plaintiffs' lease and trust arguments do not raise the same justiciability problem as did their claims based on allegations of fraud and deceit. Although the Court may not inquire into the justness of the method used to extinguish title, it is not precluded from determining whether the treaty in question actually purported to extinguish title. *See United States v. Santa Fe Pacific, supra.* (Court made determination as to whether Congress had intended to extinguish the rights which an Indian tribe had in its ancestral home, while acknowledging that if Congress had intended to do so, the judiciary could not inquire as to the method used).

*See e. g. Jackson v. Schutz,* 18 Johns. 174 (N.Y.Sup.Ct.1820). Furthermore, plaintiffs offer historical evidence which suggests that the Oneidas believed that they were leasing rather than selling their lands. However, even assuming *arguendo* that the Treaty may be properly construed as a perpetual lease, under applicable New York law the Oneidas still would not have retained an interest in the land which could be found to have come under the protection of the Nonintercourse Act in 1790.

■ Perpetual leases have traditionally been construed as leases in which the lessee had the right to possession of the land forever, with the resulting obligation to pay rent. *See e. g. Central Bank of Troy v. Heydorn,* 48 N.Y. 260 (1872). It is clear that under New York law, a perpetual lease constituted a conveyance in fee, and the grantor retained no reversionary interest in the property. *See Van Rensselaer v. Hays,* 19 N.Y. 68 (1859); *De Peyster v. Michael,* 6 N.Y. 467 (1852). Thus, even if the 1788 Treaty constituted a perpetual lease, the Oneidas would not, as alleged by plaintiffs, have had a reversionary interest in the subject lands at the time the Nonintercourse Act was passed in 1790.

■ The only interest which the Oneidas could have had in the subject lands in 1790 was the right to receive rent, for as explained by the Court in *Van Rensselaer v. Hays, supra* at 78 "where there is no reversion, as in the case of a conveyance in fee . . ., the rent reserved is an inheritable estate newly created, and descends according to the general laws of inheritance. . . ." The Indians would not even have had a right of re-entry upon failure to pay rent, since the Treaty contained no re-entry clause and none may be implied. *See Id.*

■ Thus, when the New York Legislature capitalized future rental payments into one lump sum payment in 1839, it did not affect an interest in Indian lands but only the right to receive the future rental payments.[50] Since the Nonintercourse Act by

its own terms only restricts the alienation of Indian lands, it would be inapplicable to plaintiffs' right to receive rents. Therefore, plaintiffs' attempt to federalize their lease claim by alleging a violation of the Nonintercourse Act must fail.

■ In deciding that the plaintiffs have failed to state a claim under the Nonintercourse Act, this Court has not reached any conclusions with regard to the merits of their argument that the 1788 Treaty constituted a lease under New York State law, nor does it have jurisdiction to do so. Relying on the decision of the Supreme Court in *Oneida Indian Nation v. County of Oneida, supra,* this Court initially concluded that it had jurisdiction over these actions under both 28 U.S.C. §§ 1331 and 1362. The Court's finding of jurisdiction was based upon the fact that the plaintiffs in these actions asserted claims "arising under the Constitution, laws [and] treaties of the United States." 28 U.S.C. §§ 1331 and 1362.

However, the Court has since determined that the plaintiffs have failed to state a claim under the Articles of Confederation, the Proclamation of September 22, 1783, the Treaty of Fort Stanwix and the Constitution. Having now concluded that the plaintiffs' lease argument does not state a claim for relief under the Nonintercourse Act, they are left without any federal basis for their otherwise state law lease claim.

■ Furthermore, it is the opinion of this Court, that the decision of the Supreme Court in the *Oneida Indian Nation* case does not either require or provide a basis for it to assume jurisdiction over a purely state law claim solely because it involves an Indian land transaction. The plaintiffs in that action challenged the validity of a 1788 Treaty with New York State, alleging that it violated the federal guarantees contained in treaties entered into between the Six Nations and the United States as well as the Nonintercourse Act. In finding jurisdiction, the Court concluded that the plain-

---

**50.** Rent reserved by deed without either a re-entry or distraint clause was referred to as rent-seck. George Thompson in *Thompson on Real Property,* Vol. 1A § 196 explains that with

a rent-seck, "there is no remedy for its collection except a personal action against the covenantor to pay rent."

tiffs had "asserted a current right to possession conferred by federal law, wholly independent of state law." [51] *Oneida Indian Nation, supra* 414 U.S. at 666, 94 S.Ct. 777. Plaintiffs herein also asserted a right to possession under federal law, and this Court assumed jurisdiction over their claims. However, now that those federal claims have been dismissed, plaintiffs' lease claim is "wholly" dependent upon state law and may not be pursued in this Court.[52]

## VAGUENESS CLAIM

■ For their final claim, plaintiffs allege that the 1788 Treaty was fatally vague in that the provisions for periodic increases in annual rental payments failed to specify the rate or amount of increase. Plaintiffs contend that because this material provision of the lease was so indefinite as to be unenforceable, the Treaty failed to take effect and no interest in the lands passed to the State.

According to plaintiffs, upon passage of the Nonintercourse Act in 1790, the Oneidas' title to the land became subject to the Nonintercourse Act. The United States has allegedly not approved any purported conveyance of any part of the land since that time. Plaintiffs assert that each of the defendants and defendant class members who claim an interest in the land are keeping plaintiffs out of possession in violation of the Act.

The Court need not reach the plaintiffs' claim under the Nonintercourse Act since it concludes that the Treaty is not void nor should it be voided for vagueness. The Court's finding is based upon the fact that the 1788 Treaty contains absolutely no provision for increase in the rental payments to be made to the Oneidas under the agreement. That provision being nonexistent, it may not be found to be too vague for enforcement.

■ The Court recognizes that plaintiffs allege that during the treaty negotiations, the Oneidas were led to believe that the rent would be increased as settlement of the land took place. The Court is also cognizant of the rule that in interpreting treaties entered into with Indian tribes courts may look behind the written words to determine how the Indians understood the agreement. *See Choctaw Nation of Indians v. United States, supra.* However, the Court cannot rewrite an agreement, *Id.*, and for this Court to find the 1788 Treaty void on the grounds requested by the plaintiffs would require rewriting the agreement in such a manner as to destroy its validity. Thus, plaintiffs' final claim must be dismissed as well.[53]

## CONCLUSION

For the reasons given above, this Court finds that the plaintiffs in these actions

**51.** The issue of the extent of federal authority over Indian land transactions during the Confederacy period was not before the Supreme Court in the *Oneida Indian Nation* case and was obviously not considered by them. In explaining its finding that the plaintiffs' complaint was based on federal law, the Court having recognized that fee title was at one point vested in the State, stated that "[o]nce the United States was organized *and the Constitution adopted,* ... tribal rights to Indian lands became the *exclusive* province of federal law." *Id.* 414 U.S. at 667, 94 S.Ct. 777. (emphasis added).

**52.** If any of the plaintiffs' federal claims had survived these motions to dismiss, the Court might have been able to exercise pendent jurisdiction over their state law lease claim. However, when the claims upon which federal jurisdiction is based are dismissed on a Rule 12(b)(6) motion, the pendent state claims must

be as well. *United Mine Workers of America v. Gibbs, supra.*

**53.** As previously indicated, the plaintiffs in 78–CV–104 have asserted a claim under 42 U.S.C. § 1983, which provides in pertinent part that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Since the Court has determined that the plaintiffs have failed to state a claim under either the Constitution or the Nonintercourse Act, their § 1983 claim must fail as well.

have failed to state any claims upon which relief may be granted in the federal courts. Therefore, the defendants' Rule 12(b)(6) motions to dismiss are granted, and the complaints in 78–CV–104 and 79–CV–798 are hereby dismissed. Having dismissed the complaint in 79–CV–798, the action in which the Six Nations and its constituent members have moved to intervene the motion to intervene has become moot and the Court does not reach the merits of that motion. The Court now denies that intervention motion, without prejudice.

IT IS SO ORDERED.